# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-1263V**
**Filed: July 24, 2026**

| | |
|---|---|
| ELIZABETH HOLSWORTH,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Master Horner |

*David John Carney, Green & Schafle, LLC, Philadelphia, PA, for petitioner.*
*Naseem Kourosh, U.S. Department of Justice, Washington, DC, for respondent.*

**DECISION**[1]

On September 24, 2020, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012).[2] (ECF No. 1.) The petition alleges that she suffered transverse myelitis ("TM"), or alternatively small fiber neuropathy ("SFN"), after receiving an influenza ("flu") vaccination on October 3, 2017. (*Id.*) However, respondent contested her TM diagnosis and petitioner's motion for a ruling on the written record ultimately seeks a finding that she is entitled to compensation for SFN caused by her vaccination. (ECF No. 80.) For the reasons set forth below, I conclude that petitioner is *not* entitled to an award of compensation.

## I. Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citation to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury. In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

In many cases, however, the vaccine recipient may have suffered an injury *not* of the type covered in the Vaccine Injury Table. In such instances, an alternative means exists to demonstrate entitlement to a Program award. That is, the petitioner may gain an award by showing that the recipient's injury was "caused-in-fact" by the vaccination in question. § 300aa-13(a)(1)(B); § 300aa-11(c)(1)(C)(ii). In such a situation, of course, the presumptions available under the Vaccine Injury Table are inoperative. The burden is on the petitioner to introduce evidence demonstrating that the vaccination actually caused the injury in question. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005); *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1525 (Fed. Cir. 1991). In this case, petitioner has not alleged an injury that appears on the Vaccine Injury Table. 42 C.F.R. § 100.3(a). Therefore, petitioner must demonstrate causation-in-fact.

The showing of causation-in-fact must satisfy the "preponderance of the evidence" standard, the same standard ordinarily used in tort litigation. § 300aa-13(a)(1)(A); *see also Althen*, 418 F.3d at 1278-79; *Hines*, 940 F.2d at 1525. Under that standard, petitioner must show that it is "more probable than not" that the vaccination was the cause of the injury. *Althen*, 418 F.3d at 1279. She need not show that the vaccination was the sole cause but must demonstrate that the vaccination was at least a "substantial factor" in causing the condition at issue and was a "but for" cause. *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, petitioner must supply "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Althen*, 418 F.3d at 1278 (quoting *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992)). Ultimately, petitioner must satisfy what has come to be known as the *Althen* test, which requires: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury. *Id*.

A petitioner may rely on circumstantial evidence, *Althen*, 418 F.3d at 1280, but may not receive a Vaccine Program award based solely on his or her assertions, § 300aa-13(a)(1). Rather, the petition must be supported by either medical records or by the opinion of a competent physician. *Id*. The *Althen* court noted that a petitioner need not necessarily supply evidence from medical literature supporting petitioner's causation contention. *Althen*, 418 F.3d at 1279-80. However, while scientific certainty is not required, the medical opinion supporting a petitioner's claim must be based on "sound and reliable" medical or scientific explanation. *Boatmon v. Sec'y of Health & Human Servs*., 941 F.3d 1351, 1359 (Fed. Cir. 2019). Medical records are generally viewed as particularly trustworthy evidence because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. § 300aa-13(b)(1).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1).

## II. Procedural History

Petitioner initially filed medical records and an affidavit marked as Exhibits 1-10, and the case was assigned to the undersigned in October of 2020. Respondent filed his Rule 4 Report, recommending against compensation, on October 12, 2021. (ECF No. 30.) As the case progressed, petitioner filed additional medical records and other materials, including a social security disability file, a workers' compensation rejection letter, a supplemental affidavit, and further medical records, all marked as Exhibits 11-89.

Petitioner filed an expert report and supporting materials by neurologist Justin Willer, M.D., in January of 2023. (ECF Nos. 56-58; Exs. 90-92[3].) Respondent filed a responsive report by neurologist Rebecca Spain, M.D., in April of 2023. (ECF No. 59; Exs. A-B.) Petitioner then filed additional medical records (Exhibits 93-104) and a supplemental report by Dr. Willer (Ex. 105). (ECF Nos. 61-62, 64.) Respondent filed a further report by Dr. Spain (ECF No. 66; Ex. C), and the undersigned provided the

[3] Supporting literature was marked collectively as Exhibit 92, with each article having a lettered Tabs A-U.

parties with preliminary guidance in a Rule 5 Order (ECF No. 67). Following the issuance of the Rule 5 Order, petitioner filed a further report by Dr. Willer, as well as a report by an additional expert, immunologist Omid Akbari, Ph.D. (ECF Nos. 70, 72; Exs. 106-10.[4]) Respondent responded with a further report by Dr. Spain and an additional report by immunologist Stephen Jameson, Ph.D. (Exs. D-F.)

Thereafter, the parties advised that they agreed to submit the case on the papers. (ECF No. 78.) Petitioner filed a motion for a ruling on the written record in January of 2025, seeking a finding that she is entitled to compensation for SFN caused-in-fact by her flu vaccination.[5] (ECF No. 80.) Respondent filed his response in April of 2025. (ECF No. 82.) And petitioner filed her reply in August of 2025. (ECF No. 87.) I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs*., 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record"). Accordingly, petitioner's motion is now ripe for resolution.

## III. Factual History

Although petitioner had a complicated medical history, this summary focuses on aspects of petitioner's medical records necessary to understand the parties' disagreements as to the likely etiology of petitioner's undisputed SFN. Without belaboring her prior history, several of petitioner's pre-existing conditions are relevant to the parties' disputes in this case. In particular, petitioner had a prior history of type II diabetes and hypothyroidism, as well as hypertension and hyperlipidemia. She also had a history of chronic pain complaints, most notably conditions affecting her spine that caused pain to radiate throughout her upper and lower extremities to her hands and feet. As a result of these conditions, she was treating with opioids on a long-term basis.

---

[4] Exhibit 109 included separate articles marked as Tabs A-Z and Exhibit 110 included separate articles marked as Tabs A-T.

[5] In the motion, petitioner indicates that she narrowed her claim to her alleged SFN due to the undersigned's Rule 5 Order. (ECF No. 80, p. 4.) Petitioner characterizes the Rule 5 Order as "establishing" that petitioner was likely not properly diagnosed with TM. (*Id*. at 2.) The Rule 5 Order did state that respondent's expert's opinion asserting the absence of TM was preliminarily more persuasive. (ECF No. 67, p. 2.) However, to the extent petitioner seems to suggest the Rule 5 Order compelled her abandonment of a TM allegation, that would overstate the significance of the order. While it is certainly reasonable and appropriate for petitioner to account for the preliminary guidance provided by the Rule 5 Order, it is important to clarify that the order did not *preclude* petitioner from further pursuing her TM allegation. The order explained that "[b]ecause this order is intended to guide further litigation, all of the viewpoints discussed below are necessarily preliminary and potentially subject to change based on later filed evidence or persuasive argumentation." (ECF No. 67, p. 1.) Additionally, in discussing how to proceed, the order specifically suggested, as an alternative to seeking to substantiate her SFN allegation, that petitioner might seek to address the concerns that had been raised regarding the TM diagnosis. (*Id*. at 3.) And, indeed, Dr. Willer did subsequently, at least briefly, address the primary issue noted in the Rule 5 order. (Ex. 106, p. 5.)

She was also a smoker. This history is not in dispute. (ECF No. 80, pp. 5-6; ECF No. 82, p. 3.)

Shortly before the vaccination at issue, petitioner began seeing a new pain management specialist on September 27, 2017. (Ex. 39, p. 18.) She reported chronic back and neck pain radiating to her hands and feet and suggested that the pain medication prescribed by her primary care provider over the prior years was no longer effective. (*Id*.) Petitioner was not eligible for a new opioid prescription at the first visit and was advised to follow up again in three to four weeks. (*Id*. at 20.)

A day later, on September 28, 2017, petitioner presented to her primary care provider, Dr. Bennov. (Ex. 3, p. 57.) Her chief complaints pertained to a follow up regarding a prior procedure, her diabetes, and her chronic pain. However, the “Reason for visit” noted “Pain in both feet.” (*Id*.) The history of present illness for her diabetes noted that she had “[c]omplaints [of] both feet tingling sensation of pain, burning sensation, no ulcers.” (*Id*.) The neurologic exam was noted to be “unremarkable,” but a diabetic foot exam indicated:

> Right foot posterior tibial pulse present (weak); Right foot dorsalis pedis pulse present (weak); Left foot posterior tibial pulse present (weak); Left foot dorsalis pedis pulse present (weak); Normal skin color and temperature; Right foot patient can feel on all five areas 10 gram nylon monofilament (sensation absent); Left foot patient can feel on all five areas 10 gram nylon monofilament (sensation absent); Diabetic peripheral neuropathy associated with type 2 diabetes mellitus; Chronic painful diabetic neuropathy; Corns and callosities; Peripheral vascular disease, unspecified.

(*Id*. at 59.) In relevant part, petitioner was diagnosed with diabetic autonomic neuropathy due to type 2 diabetes, which was noted to be stable and for which she was prescribed Neurontin (a brand name for gabapentin), as well as a peripheral circulatory disorder associated with type 2 diabetes, which was also noted to be stable and for which she was recommended aspirin and lifestyle changes. (*Id*. at 60.)

Petitioner then received the flu vaccination at issue on October 3, 2017. (Ex. 1, p. 1.) Despite her September 28, 2017 evaluation for tingling and burning sensations in her feet, in her written statement prepared for this case petitioner stated that she received her flu vaccination on October 3, 2017, and “[a]bout three days later, I began to experience a new onset of burning sensation in my feet, along with weakness in my lower extremities. The weakness progressively worsened to the point where I needed to be evaluated.” (Ex. 2, pp. 1-2.)

On October 18, 2017, petitioner presented for her anticipated follow up with her pain management specialist. (Ex. 39, p. 7.) She did not specifically mention her flu vaccination. However, her complaints now included a report of numbness and burning sensation affecting her feet, as well as upper extremity paresthesia, that had not been

discussed at her initial September 27, 2017 encounter with the same provider. (*Compare* Ex. 39, p. 7, *with id.* at 18.) No onset was identified for these symptoms. An EMG/NCS was ordered for petitioner's lower extremities. (*Id*. at 9.) A venous Doppler duplex scan of her lower extremities performed the next day was normal. (Ex. 87, p. 139.)

Petitioner presented to the emergency department about a week later, on October 25, 2017. At triage, petitioner initially reported at 11:31AM that she was experiencing bilateral lower extremity tingling and burning of the feet "starting 2 weeks ago after getting flu shot." (Ex. 4, p. 12.) (This would place onset on or about October 11, 2017, which would be just about one-week post-vaccination.) Petitioner provided the same history to another nurse at about 2:00PM that day. (*Id*. at 13.) However, petitioner later provided a history at 3:54PM of

> 2-3 weeks of sensory changes in her feet describes as burning. She was doing well until 2-3 days after receiving her flu shot in late September/early October. By 10/12 she had numbness in her feet. She now reports mild weakness of the bilateral lower extremities and worsening of her baseline lower back pain. She was put on Gabapentin earlier this month. She endorses some intermittent weakness in her hands at this point.

(*Id*. at 16.) Here, petitioner does place her symptoms close in time following her vaccination, closer even than she had reported earlier in the morning; however, she indicates uncertainty as to when her vaccination occurred, suggesting it could have been late September, which would be more consistent with the fact of her prior September 28 encounter with her primary care provider for her tingling and burning sensations. She also misrecalls being prescribed Gabapentin "earlier this month," whereas she was actually prescribed Gabapentin at the September 28, 2017 encounter. Later, however, while still at the emergency department, she reported at around 7:40PM that her symptoms more definitively started "3 days [status post] flu shot on 10/3." (*Id.* at 13.) In another history, she again indicated that her symptoms began three days post-vaccination. (*Id*. at 17.) However, she also again expressed that the vaccination may have occurred in late September or October. (*Id.*) She further reported that the complete numbness of the soles of her feet occurred on about October 12, and she recalled a specific incident on October 13, 2017, wherein she was unable to effectively use the brakes in her car and almost experienced a collision. (*Id.*) In some histories, petitioner reported that her symptoms progressed to include her hands. (*Id*. at 6, 10, 16.)

The initial differential diagnosed in the emergency department was diabetic neuropathy versus post-surgical neuropathy versus malignancy GBS. (Ex. 4, p. 9.) A post-surgical cause was considered unlikely as petitioner was several months out from her prior surgery. (*Id.*) Diabetic neuropathy was also thought to be less likely because her diabetes was well controlled. (*Id.*) In particular, the neurologist felt she had length-dependent sensory changes suggestive of polyneuropathy. (*Id*. at 17.) A head CT showed a small subcortical hypodensity in the parasagittal left parietal lobe, but this was

felt to be chronic and unlikely to account for petitioner's new symptoms. (*Id*. at 9.) A lumbar puncture was normal except for elevated glucose of 75 mg/dL (reference range 40-70 mg/dL). (*Id*. at 63.) Bloodwork was also largely normal, except that petitioner had elevated hemoglobin A1C of 6.5%. (*Id.* at 31-37, 61-62.) Petitioner was discharged with a working diagnosis of GBS or possible peripheral neuropathy and was instructed to follow up with a neurologist. (*Id*. at 11-12.)

Petitioner then saw a neurologist, Dr. McCloskey, on November 28, 2017.[6] (Ex. 5, p. 14.) The history indicated that

> [i]n September she received a flu shot. Within 2-3 days she developed stabbing pains in both feet. This has persisted. . . . This was followed by weakness in both legs that began about 2-3 days later. That has persisted. . . . She became unsteady on her feet. . . . She has a sense of weakness in her hands. She denies associated numbness of the chest or trunk.

(*Id*. at 15.) The neurologist was primarily concerned for a spinal etiology, such as transverse myelitis. (*Id*. at 19.) Spine and brain MRIs were ordered, along with an EMG/NCS. (*Id*.)

On December 14, 2017, petitioner underwent a cervical spine ("C-spine") MRI with and without contrast, which showed multilevel degenerative changes, with reversal cervical lordosis, mild ventral central canal narrowing at C4-C7, and severe right-sided foraminal narrowing at C6-C7. (Ex. 5 at 78-82.) Petitioner also underwent a thoracic spine ("T-spine") MRI with and without contrast, which showed no T-spine canal or neural foraminal stenosis, but did show mild thoracic kyphosis centered at T6-T7, where there was a shallow disc bulge indenting the ventral thecal sac. (*Id*.)

When petitioner returned to Dr. McCloskey on February 14, 2018, she reported ongoing burning, icy, and stabbing pain in her lower extremities below the knees and in her hands and forearms. (Ex. 5, p. 31.) She had normal strength and reflexes with no allodynia or hypersensitivity. (*Id*. at 38.) She had reduced pinprick and temperature sensation from the toes to upper calves and from her fingers to her upper forearms. (*Id.*) She underwent an EMG/CNS which were normal "save for mild reduction of sural amplitudes bilaterally." (*Id.*) The neurologist now felt that SFN was probable and noted that he questioned whether it was related to the vaccine, as well as whether it was related to rheumatologic and other causes. (*Id.*) He ordered additional lab tests and a skin biopsy, and he provided referrals to rheumatology and pain management. (*Id*.)

Thereafter, petitioner returned to Dr. Bennov on March 19, 2018, and reported a post-vaccination onset of symptoms. (Ex. 3, p. 54.) He changed his assessment to neuropathy of unclear etiology and recommended further follow up with neurology and

---

[6] She also saw an orthopedist in the interim on November 2, 2017. (Ex. 9, p. 14.) The history she provided at that time indicates: "She returned to work on 9/19 and on 10/3 she had a flu shot at work. She has had burning into both feet since then . . . ." (*Id*.)

pain management. (*Id.*) Shortly thereafter, on April 12, 2018, a skin biopsy of petitioner's left calf and foot indicated significantly reduced epidermal nerve fiber density, consistent with SFN. (*Id.* at 7-8.) As discussed below, both parties' experts interpreted the skin biopsy as showing a non-length-dependent pattern of nerve loss.

When petitioner returned to the neurologist, she reported that a rheumatologist had not found any evidence of a rheumatologic condition. (Ex. 5, p. 44.) The neurologist diagnosed small fiber predominant sensory polyneuropathy. (*Id.*) He noted that it was in "[t]emporal association with vaccination," but stopped short of opining as to the cause of the condition, further indicating that "[e]valuation for cause negative." (*Id.*)

Petitioner has extensive additional records, which I have reviewed; however, it is not necessary to summarize these records in light of the analysis that follows, except to note that later rheumatology work up continued to find no systemic autoimmune condition. (Ex. 104, p. 4.) Although some of petitioner's subsequent encounters raised a suspicion for multiple sclerosis ("MS"), that is not ultimately at issue.

## IV. Summary of Expert Opinions

Although there was some suspicion for MS, both parties' experts agree that she does not have MS. (Ex. 90, p. 6; Ex. A, p. 17.) On petitioner's behalf, Dr. Willer opined that petitioner's overall clinical presentation is explained by a combination of TM and SFN. (Ex. 90, p. 16.) However, petitioner has not ultimately argued that she is entitled to compensation for TM. (ECF Nos. 80, 87.) And, indeed, Dr. Akbari's opinion upon which petitioner relies for her theory of causation is exclusive to SFN. (Ex. 107.) On respondent's behalf, Dr. Spain does not agree that petitioner suffered TM and instead opines that petitioner's overall clinical presentation is explained by a combination of degenerative disc disease, generalized osteoarthritis, SFN, pelvic surgeries, anxiety, obesity, opioid dependence, polypharmacy, immobility, and psychosocial pressures. (Ex. A, p. 17.) Importantly though, although Dr. Spain attributes petitioner's SFN to other causes, she does not dispute that petitioner did suffer SFN even as SFN does not necessarily explain her complete medical history. (*Id.*) Accordingly, while I have considered the experts' opinions holistically, only those aspects of the expert reports speaking to petitioner's SFN and its potential causes are discussed below.[7]

[7] I note only briefly in the interest of completeness that, even if petitioner had continued to affirmatively argue she suffered vaccine-caused TM, and even if I agreed that Dr. Willer's final report (Ex. 106, p. 5) was sufficient to overcome the diagnostic issue raised in the Rule 5 order, the record evidence does not preponderantly demonstrate that the flu vaccine can cause TM. Only Dr. Willer's first report meaningfully addressed that topic. (Ex. 90, pp. 7-8; *see also* Ex. 105, p. 18.) And although Dr. Willer seeks to establish that TM is a post-infectious inflammatory condition such that vaccine causation is also reasonably plausible, very little of Dr. Willer's discussion would specifically implicate the flu vaccine as a cause of TM. Indeed, other vaccines feature much more prominently in his discussion.

**a. Neurology**

i. Initial Report by Petitioner's Neurologist, Justin Willer, M.D.[8]

Dr. Willer opines to a reasonable degree of medical probability that petitioner suffered SFN as evidenced by her positive skin biopsy. (Ex. 90, p. 16 (citing Ex. 23, p. 4).) Dr. Willer describes SFN "physiologically or anatomically as a sensory neuropathy that exclusively or predominately affects small fibers and their functions. Small somatic or autonomic fibers, or both, may be involved." (*Id*. at 9 (quoting David Lacomis, *Small-Fiber Neuropathy*, 26 MUSCLE & NERVE 173 (2002) (Ex. 92, Tab L; *see also* Ex. A, Tab 18)).) According to Dr. Willer, SFN can be divided into three different subgroups – inflammatory, hyperglycemic, and idiopathic. (*Id*. (citing Steven MacDonald et al., *Longitudinal Follow-Up of Biopsy-Proven Small Fiber Neuropathy*, 60 MUSCLE & NERVE 376 (2019) (Ex. 92, Tab M)).) Dr. Willer suggests that symptoms of autonomic dysfunction (lightheadedness, diarrhea/constipation, urinary urgency, and hyperhidrosis) are associated with the inflammatory subgroup. (*Id*. (citing MacDonald et al., *supra*, at Ex. 92, Tab M).) SFN can also be subdivided as between length-dependent and non-length-dependent patterns of neuropathy, with inflammatory cases having a higher percentage of the non-length-dependent pattern. (*Id*. (citing MacDonald et al., *supra*, at Ex. 92, Tab M).)

Although Dr. Willer acknowledges that diabetes is a common cause of SFN, he also asserts that post-vaccination and post-viral SFN has been reported. (Ex. 90, pp. 9-10 (citing Waqar Waheed et al., *Post Covid-19 Vaccine Small Fiber Neuropathy*, 64 MUSCLE & NERVE E1 (2021) (Ex. 92, Tab R; *see also* Ex. 110, Tab L); Farinza Safavi et al., *Neuropathic Symptoms with SARS-CoV-2 Vaccination* (unpublished manuscript) (Ex. 92, Tab N); Farzam Khokhar et al., *Small Fiber Neuropathy Associated with the Moderna SARS-CoV-2 Vaccine*, 14 CUREUS e25969 (2022) (Ex. 92, Tab J); Rory M. C. Abrams et al., *Small Fiber Neuropathy Associated with SARS-CoV-2 Infection*, 65

---

[8] Dr. Willer received his medical degree from the University of Health Sciences/The Chicago Medical School in 1987, before going on to complete an internship in internal medicine from Brookdale Hospital Medical Center in 1988, followed by a residency in ophthalmology from Temple University Hospital in 1989 and two neurology residencies: the first from Long Island Jewish Medical Center in 1991 and the second from Mount Sinai Hospital Medical Center (NY) in 1993. (Ex. 91, pp. 1, 3.) From there, Dr. Willer completed an Epilepsy/EEG/EP/Intraoperative Monitoring Fellowship at the University of Miami International Center for Epilepsy in 1994, as well as an EMG/Neuromuscular Diseases Fellowship at SUNY Health Sciences Center at Brooklyn in 1995. (*Id.* at 3.) During his fellowships, he worked as an attending physician at Kings County Medical Center, and in 1995, he accepted a position as an assistant neurologist at Maimonides Hospital Medical Center. (*Id.* at 1.) Although he has maintained his position as an assistant neurologist at Maimonides Hospital Medical Center since 1995, he has also briefly worked in the electrodiagnostic laboratory at Maimonides Hospital Medical Center, as an assistant attending neurologist at Long Island College Hospital, and as an attending neurologist in the electrodiagnostic laboratory at University Hospital. (*Id.*) Dr. Willer has also worked as an assistant professor of clinical neurology and as a neuromuscular consultant in STAR Clinic at State University of New York, HSC at Brooklyn. (*Id.*) He is board certified in electrodiagnostic medicine, as we;; as psychiatry and neurology with added qualifications in clinical neurophysiology, and he maintains active medical licenses in New York, New Jersey, and Florida. (*Id.* at 1-2.) He has authored three publications and seven abstracts. (*Id.* at 3-4.)

MUSCLE & NERVE 440 (2022) (Ex. 92, Tab A)).) In particular, Dr. Willer cites several case series of SFN patients who reported preceding vaccinations. (*Id.*) However, these cases all followed Covid, rather than flu, vaccinations. (*Id.*) Nonetheless, he finds it significant that these cases include patients suffering with well controlled diabetes who experienced post-vaccinal SFN. (*Id.* at 16 (citing Khokhar et al., *supra*, at Ex. 92, Tab J); Abrams et al., *supra*, at Ex. 92, Tab A).) He explains that "[i]t is my opinion on a more likely than not basis that even though she had diabetes, the small fiber neuropathy is due to the vaccination as she was not symptomatic prior to vaccination." (*Id.*) He opines that the onset of petitioner's SFN occurred between one to two weeks following her October 3, 2017 flu vaccination. (*Id.*)

ii. Initial Report by Respondent's Neurologist, Rebecca Spain, M.D.[9]

Dr. Spain agrees with the diagnosis of SFN for petitioner's clinical symptoms of stabbing pain in both feet, as well as loss of pin and temperature sensation in her legs. (Ex. A, p. 15.) However, she does not agree that the SFN can be attributed to petitioner's flu vaccination. Although petitioner had reported a post-vaccination onset to her treating physician, the medical records document that she had already complained about pain in her feet about a week prior to the vaccination on September 28, 2017. (*Id.* (citing Ex. 3, pp. 57-61).) Indeed, at that time petitioner's complaints were assessed as "diabetes mellitus type 2/neuropathy," which is a common cause of SFN. (*Id.*) Dr. Spain suggests that petitioner's later biopsy should be taken as confirmation that the initial diagnosis of diabetic neuropathy can be refined to a more specific diagnosis of SFN. (*Id.* at 15-16.) Dr. Spain also notes that petitioner had several other known risk factors for SFN, including elevated triglycerides, hypothyroidism, vitamin D deficiency, and tobacco use. (*Id.* at 15.) Dr. Spain opines that petitioner had typical symptoms of SFN prior to vaccination that continued on an indolent course following the vaccination. (*Id.* at 16.) In addition to disagreeing with Dr. Willer's assessment of the onset of petitioner's SFN, she also notes that none of the case reports he cited involved the flu

[9] Dr. Spain received her medical degree from Case Western Reserve University School of Medicine in 2002, before going on to complete an internship in internal medicine at Brown University in 2003, and a neurology residency at Thomas Jefferson University in 2006. (Ex. B, p. 1.) From there, Dr. Spain completed two fellowships: one in neuro-immunology at Thomas Jefferson University and another in multiple sclerosis rehabilitation at Oregon Health & Science University (OHSU). (*Id.*) During her fellowships, Dr. Spain worked as a senior instructor in neurology at OHSU, and in 2010, she accepted a position as an assistant professor of neurology at OHSU. (*Id.* at 2.) She was eventually elevated to associate professor in 2018. (*Id.*) In 2016, Dr. Spain began working as the Associate Director of Clinical Care for the VA Multiple Sclerosis Center for Excellence West at the VA Portland Health Care System, and in 2020, she became the Director of the VA Portland Health Care System Multiple Sclerosis Regional Program. (*Id.*) Additionally, she has worked as a staff neurologist at the VA Portland Health Care System since 2008. (*Id.*) She is board certified in psychiatry and neurology, and she maintains an active medical license in Oregon. (*Id.* at 1-2.) In her clinical capacity, about a quarter of her time is "devoted to outpatient and inpatient clinical care of patients with neuro-immunological conditions, including transverse myelitis and MS as is pertinent to this case, as well [as] general neurological disorders including neuropathy." (Ex. A, p. 1.) She has authored 56 peer reviewed publications, 5 non-peer reviewed publications, 3 chapters, 2 peer-reviewed reviews, and 60 abstracts. (Ex. B, pp. 4-13.) She also regularly reviews the relevant literature, serves as an ad hoc reviewer for peer reviewed manuscripts, and presents at national and international meetings. (Ex. A, p. 1.)

vaccine. (*Id*.) Nor, in any event, would Dr. Spain be persuaded by temporal association alone. (*Id*. at 13, 16.)

iii. <u>Second Report by Dr. Willer[10]</u>

While Dr. Spain had noted that SFN mainly has a static to slowly progressive course (Ex, A, p. 13), Dr. Willer stresses that "[t]he key point is once it develops it becomes static as [a] diagnosis of small fiber neuropathy is frequently delayed." (Ex. 105, p. 3.) In response to Dr. Spain's report, Dr. Willer acknowledges that there are no prior reports of the influenza vaccine causing SFN. However, he argues that this does not rule it out as a cause. (*Id*. at 4.) He asserts that the prevalence of neuropathy among diabetics is much lower than what Dr. Spain cites. (*Id*. (citing R.E. Maser et al. *Epidemiological Correlates of Diabetic Neuropathy. Report from Pittsburgh Epidemiology of Diabetes Complications Study*, 38 DIABETES 1456 (1989); P.J. Dyck et al., *The Prevalence by Staged Severity of Various Types of Diabetic Neuropathy, Retinopathy and Nephropathy in a Population-Based Cohort: The Rochester Diabetic Neuropathy Study*, 43 NEUROLOGY 817 (1993)).) And, although Dr. Spain noted the complaint of foot pain as of September 28, 2017, Dr. Willer relies on later record of February 16, 2018, in which petitioner distinguished her post-vaccination symptoms from anything she had previously experienced.[11] (*Id*. at 5 (citing Ex. 5, p. 31).) Moreover, he questions how petitioner could have had diabetic neuropathy at her September 28, 2017 encounter given that the neurologic exam at that encounter was noted to be unremarkable, which he contends is inconsistent with both the treating physician's and Dr. Spain's conclusion. (*Id*. at 1.) He also asserts that the fact that petitioner began experiencing symptoms in her hands post-vaccination suggests an inflammatory SFN because a non-length-dependent pattern is more readily associated with inflammatory SFN than diabetic SFN. (*Id*. at 5 (citing Dyck et al., *supra*).) Dr. Willer also disputes that vitamin D deficiency is an established cause of SFN. (*Id*. at 15-16 (citing NIH Office of Dietary Supplements: Fact Sheet for Consumers; Transverse Myelitis Consortium Working Group, *Proposed Diagnostic Criteria and Nosology of Acute Transverse Myelitis*, 59 NEUROLOGY 488 (2002)).) Moreover, he suggests that petitioner's vitamin D, triglycerides, and TSH levels were not significantly abnormal such that they would be a likely cause of her SFN. (*Id.* at 16.)

[10] The literature referenced in Dr. Willer's first and second supplemental reports (Exs. 105 and 106) was not filed into the record. Accordingly, it has not been considered. However, Dr. Willer's corresponding statements have still been considered to the extent they are within his area of expertise, even though the accompanying literature has not been made available. Additionally, where possible, I have relied on respondent's filing of the same articles. Ultimately, given the subject matter of the unfiled articles and the analysis below, it is not necessary to direct petitioner to belatedly file the missing literature.

[11] The record Dr. Willer cites is not really clear on this point. It states that petitioner "[c]ontinues to have lower extremity predominant severe burning, icy, stabbing pain in both feet and below the knees but also in hands and distal forearms that is constant but exacerbates at night. It disturbs her sleep. Symptoms began within a few days of receiving flu vaccine." (Ex. 5, p. 31.) Although Dr. Willer is correct that this does explicitly place these particular symptoms post-vaccination, and Dr. Willer can reasonably compare and contrast different records, this record itself does not actually distinguish the nature of petitioner's pre- and post-vaccination health as Dr. Willer seems to imply.

iv. Second Report by Dr. Spain

In response to Dr. Willer's concern that the neurologic exam on September 28, 2017 is inconsistent with the presence of a neuropathy at that time, Dr. Spain explains that encounter record as follows:

> There is a simple explanation for this: the neurologic exam performed as part of a general physical exam is not as detailed as the diabetic foot exam. Dr. Bennov's diabetic foot exam added monofilament sensory testing (noted as absent in both feet) and posterior tibial and dorsalis pedis pulse evaluations (noted as weak in both feet). Thus, a general neurological screening exam can be normal while a detailed diabetic foot exam is abnormal.

(Ex. C, pp. 5-6.) Dr. Spain agrees that the September 28, 2017 exam was not diagnostic of a large fiber polyneuropathy, but stresses that diabetes can cause multiple types of neuropathy. (*Id*. (citing Kamakshi Patel et al., *Diabetic Neuropathies*, 63 MUSCLE & NERVE 22 (2021) (Ex. C, Tab 2)).) Ultimately, petitioner had painful neuropathic symptoms prior to vaccination that are consistent with her subsequently confirmed SFN. (*Id*.)

Noting that petitioner was also seen for a complaint of chronic pain radiating from her shoulders to her hands in September of 2017 (Ex. 39, p. 18), Dr. Spain does not agree with Dr. Willer's suggestion that petitioner's symptoms changed post-vaccination, though she acknowledges petitioner's subjective descriptions varied. (Ex. C, p. 6.) According to Dr. Spain, this underscores the need for objective testing to diagnose neuropathies, given that sensory examination is necessarily subjective. (*Id*. (citing Lacomis, *supra*, at Ex. A, Tab 18).) Thus, because petitioner did not have a skin biopsy prior to vaccination, it is difficult to conclude that her condition changed post-vaccination. (*Id*.) Given this lack of objective evidence, Dr. Spain suggests the lack of support for the proposed causal relationship in the medical literature should be viewed as further undercutting Dr. Willer's opinion. (*Id*. at 6-7.) Although Dr. Spain acknowledges that some of the medical records include notes attributing petitioner's condition to her flu vaccine, she asserts this is carried over from incorrect histories that petitioner provided to her treaters. (*Id*. at 7.)

v. Third Report by Dr. Willer

Dr. Willer disagrees that petitioner's reported post-vaccination symptoms were only subjective. He stresses that petitioner's post-vaccination symptoms affected her hands and forearms and lower limbs equally. (Ex. 106, pp. 1-2 (citing Ex. 5, p. 31; Ex. 4, p. 6).) He explains:

> The pattern of involvement of the upper limbs equal to the involvement of the legs is a non-length dependent pattern. In a length dependent pattern

> nerve repair is produced by the nerve growing from the spinal cord to reinnervate the affected area. Given that the legs are longer than the arms means that symptoms typically start in the legs first and objective evidence of damage shows greater damage distally than proximally since it takes longer to reinnervate an area at a greater distance. The farther away the area is from the spinal cord the less likely repair will catch up to the damage.

(*Id*. at 2.) Moreover, he notes that petitioner's own SFN was confirmed to be non-length-dependent by her biopsy, which found lower epidermal nerve fiber density at the calf as compared to the foot. (*Id.* (citing Ex. 3, p. 7).) Because a non-length-dependent pattern was found in only 3.7% of hyperglycemia SFN compared to 30% among inflammatory SFN, Dr. Willer opines that this is "incontrovertible proof that the symptoms she had post-vaccination had nothing to do with the symptoms she had in September 2017 as symptoms due to diabetic neuropathy in 2017 would have produced a length dependent process which is the most typical pattern of diabetic neuropathy." (*Id*. (citing Steven MacDonald et al., *Longitudinal Follow-Up of Biopsy-Proven Small Fiber Neuropathy*, 60 MUSCLE & NERVE 376 (2019) (Ex. A, Tab 20)).) Therefore, he opines that the onset of petitioner's SFN must have been post-vaccination, otherwise it would have resulted in a length-dependent pattern. (*Id*. at 3 (citing MacDonald et al., *supra*, at Ex. A, Tab 20; Abrams et al., *supra*, at Ex. 92, Tab A).)

vi. <u>Third Report by Dr. Spain</u>

Although Dr. Willer purported to indicate that petitioner's post-vaccination symptoms were not only subjective, Dr. Spain stresses that Dr. Willer only cited histories provided by petitioner and not any exam findings. Thus, Dr. Willer has not actually presented evidence of anything other than petitioner's subjective account. (Ex. D, p. 1.) In any event, Dr. Spain stresses that the sensory component of a neurologic exam is itself subjective. (*Id*.) Moreover, Dr. Spain does not agree that either the MacDonald or Abrams papers cited by Dr. Willer indicate that a non-length-dependent pattern of SFN indicates an inflammatory cause. (*Id*. at 1-2.) Contrary to what Dr. Willer suggests, the post-Covid infection SFN subjects experienced length-dependent, rather than non-length-dependent, SFN. (*Id*. at 2 (citing Abrams et al., *supra*, at Ex. 92, Tab A).) Moreover, the MacDonald paper, though it did observe a greater portion of non-length-dependent SFN among the inflammatory subgroup especially when compared to the hyperglycemic group, also observed that 11.7% of the idiopathic cases were non-length-dependent. (*Id*. at 1-2 (citing MacDonald et al., *supra*, Ex. A, Tab 20).) Because petitioner had risk factors that could also have placed her in the idiopathic group, this undercuts the notion that the pattern of SFN necessarily points to an inflammatory etiology. (*Id*.)

**b. Immunology**

i. Report by Petitioner's Immunologist, Omid Akbari, Ph.D. [12]

Dr. Akbari cites a number of case reports of patients experiencing SFN subsequent to various vaccinations, though only one involved the flu vaccine. (Ex. 107, pp. 22-24 (citing Jafar Kafaie et al., *Small Fiber Neuropathy Following Vaccination*, 18 J. CLINICAL NEUROMUSCULAR DISEASE 37 (2016) (Ex. 109, Tab S); Nizar Souayah et al., *Small Fiber Neuropathy Following Vaccination for Rabies, Varicella or Lyme Disease*, 27 VACCINE 7322 (2009) (Ex. 110, Tab H); Waheed et al., *supra*, at Ex. 110, Tab L; J.H.K. Hull et al., *Severe Vasculitic Neuropathy Following Influenza Vaccination*, 75 J. NEUROLOGY NEUROSURGERY PSYCHIATRY 1507 (2004) (Ex. 109, Tab O)).) He asserts that these cases demonstrate that "vaccine-induced SFN shares common underlying mechanisms, including inflammasome activation, innate and T cell-mediated immune responses, and damage to both myelinated and unmyelinated nerve fibers." (*Id*. at 25.)

Dr. Akbari indicates that

> T cells, which mature in the thymus and are called CD4+ cells, are differentiated by antigenic stimulation into different effector subsets called T helper ($T_H$) cells, and are characterized by their production of specific cytokines and effector functions. $T_H$ cells are not cytotoxic or phagocytic, but rather are the cells that direct other cells to perform these tasks, such as cytotoxic T cells. There are two classical types of T helper cells, Th1 and Th2 cells, which develop into effector T cells and are known to help eliminate different types of pathogens. Th1 cells have been reported to be elevated in patients and have a pathogenic role in various neuropath[ies].

(Ex. 107, p. 6 (citing Hania Kebir et al., *Preferential Recruitment of Interferon-γ–Expressing $T_H$17 Cells in Multiple Sclerosis*, 66 ANNALS NEUROLOGY 390 (2009) (Ex. 109, Tab U)).)

Ultimately, however, Dr. Akbari stresses a third subset of Th cells – Th17 cells. (Ex. 107, p. 7.) Dr. Akbari cites a number of publications for the proposition that Th17 cells, which secrete the proinflammatory cytokines Interleukin ("IL")-17 and tumor

[12] Dr. Akbari received his Ph.D. in cellular and molecular immunology from the University of London in 1998, before going on to complete a post-doctoral fellowship at Stanford University in 2001. (Ex. 108, p. 1.) He maintains a position as a professor of immunology at the University of Southern California, Los Angeles. (*Id.* at 2.) Prior to that, he worked as a research scientist in the Division of Allergy and Immunology at Stanford University and an assistant professor of pediatrics in the Division of Immunology at Harvard Medical School. (*Id.*) Pertinent here, Dr. Akbari's research investigates the role of immune tolerance and immune cells in triggering autoimmune and allergic diseases with a focus on "the intricate mechanisms that underpin the regulation of both acquired and innate immune responses" and "consequential inflammation triggered by antigens, allergens, and vaccines." (*Id.* at 4.) He has authored over 120 publications. (Ex. 108, pp. 15-33.)

necrosis factor ("TNF")-α, are associated with many autoimmune diseases, including inflammation leading to demyelination and neuropathy.[13] (*Id.* at 7, 17-19.) Moreover, he cites two studies for the specific proposition that Th17 cells contribute to small fiber neuropathy. (*Id*. at 19 (citing Caixia Sun et al., *IL-17 Contributed to the Neuropathic Pain Following Peripheral Nerve Injury by Promoting Astrocyte Proliferation and Secretion of Proinflammatory Cytokines*, 15 MOLECULAR MED. REPS. 89 (2017) (Ex. 110, Tab J); Varvara A. Ryabkova et al., *Neuroimmunology: What Role for Autoimmunity Neuroinflammation, and Small Fiber Neuropathy in Fibromyalgia, Chronic Fatigue Syndrome, and Adverse Events After Human Papillomavirus Vaccination?*, 20 INT'L J. MOLECULAR SCIS. 1 (2019) (Ex. 110, Tab E)).) Cytokines, including IL-1, IL-6, and TNF-α, have been shown experimentally to induce demyelination and have also been observed as playing a role in the induction of Th17 cells. (*Id*. at 17 (citing Mei et al., *supra*, at Ex. 110, Tab B).) He stresses that SFN involves damage to peripheral nerves that include small myelinated and lightly myelinated nerve fibers. (*Id*. at 13.)

Dr. Akbari asserts that both flu infection and vaccination are capable of inducing IL-17 and Th17. (Ex. 107, pp. 17-18 (citing Bermejo-Martin et al., *supra*, at Ex. 109, Tab B); Lin et al., *supra*, at Ex. 109, Tab Y)).) Specifically,

> The activation of the inflammasome by flu vaccine, leads to several downstream effects. One such effect is the activation of caspase-1, facilitating the conversion of the IL-1 family's precursor cytokines into their active forms, notably IL-1a and IL-1b. Activation of the inflammasome also results in the production of IL-1, IL-6, and TNF-α by antigen-presenting cells. These cytokines, especially IL-1 and IL-6, are crucial for the initial signaling to naive CD4 T cells, encouraging the differentiation into Th17 cells.

(*Id*. at 22 (endnotes omitted) (citing Luisa Kress et al., *Cytokine Expression Profiles in White Blood Cells of Patients with Small Fiber Neuropathy*, 24 BMC NEUROSCI. 1 (2023) (Ex. 109, Tab W); Ya-Hong Zheng et al., *A Cross-Sectional Study on the Correlation Between Inflammatory Cytokines, Negative Emotions, and Onset of Peripheral Neuropathy in Type 2 Diabetes*, 16 NEUROPSYCHIATRIC DISEASE & TREATMENT 2881 (2020) (Ex. 110, Tab T)); *see also id*. at 14-15 (discussing Stephen N. Crooke et al., *Inflammasome Activity in Response to Influenza Vaccination Is Maintained in Monocyte-*

---

[13] Citing José Francisco Zambrano-Zaragoza et al., *Th17 Cells in Autoimmune and Infectious Diseases*, INT'L J. INFLAMMATION, 2014, at 1 (Ex. 110, Tab S); Marinos C. Dalakas, *Future Perspectives in Target-Specific Immunotherapies of Myasthenia Gravis*, 8 THERAPEUTIC ADVANCES NEUROLOGICAL DISORDERS 316 (2015) (Ex. 109, Tab F); F. Jadidi-Niaragh & A. Mirshafiey, *Th17 Cell, the New Player of Neuroinflammatory Process in Multiple Sclerosis*, 74 SCANDINAVIAN J. IMMUNOLOGY 1 (2011) (Ex. 109, Tab Q); Feng-Jun Mei et al., *Th1 Shift in CIDP Versus Th2 Shift in Vasculitic Neuropathy in CSF*, 228 J. NEUROLOGICAL SCIS. 75 (2005) (Ex. 110, Tab B); Jesus F. Bermejo-Martin et al., *Th1 and Th17 Hypercytokinemia as Early Host Response Signature in Severe Pandemic Influenza*, 13 CRITICAL CARE 1 (2009) (Ex. 109, Tab B); Yinyao Lin et al., *Th17 Cytokines and Vaccine-Induced Immunity*, 32 SEMINARS IMMUNOPATHOLOGY 79 (2010) (Ex. 109, Tab Y); Shujuan Li et al., *Circulating Th17, Th22, and Th1 Cells Are Elevated in the Guillain-Barré Syndrome and Downregulated by IVIg Treatments*, MEDIATORS INFLAMMATION, 2014, at 1 (Ex. 109, Tab X).

*Derived Peripheral Blood Macrophages in Older Adults*, 2 FRONTIERS AGING 1 (2021) (Ex. 109, Tab E); Pin Wan et al., *AP-1 Signaling Pathway Promotes Pro-IL-1β Transcription to Facilitate NLRP3 Inflammasome Activation Upon Influenza A Virus Infection*, 13 VIRULENCE 205 (2022) (Ex. 110, Tab M); Xing Yang et al., *KSHV-Encoded ORF45 Activates Human NLRP1 Inflammasome*, 23 NATURE IMMUNOLOGY 916 (2022) (Ex. 110, Tab Q); Ella Hartenian & Petr Broz, *Viral Protein Activates the NLRP1 Inflammasome*, 23 NATURE IMMUNOLOGY 818 (2022) (Ex. 109, Tab N)).)

Further to this, Dr. Akbari opines that the flu vaccine is capable of stimulating autoreactive T cells against lightly myelinated or unmyelinated small fibers.[14] (Ex. 107, pp. 20, 22.) Specifically, he opines that a six amino acid stretch within the hemagglutinin in the flu vaccine (fyknli) is sufficiently homologous to an amino acid stretch within myelin basic protein (ffkniv) such that it has cross-reactive potential via molecular mimicry. (*Id*. at 20-21.) Dr. Akbari cites several studies for the proposition that a five out of twelve amino acid match is sufficient to be disease-causing, but does not supply any citation providing context for his identification of these two sequences. He cited two other studies for the proposition that hemagglutinin peptide can lead to molecular mimicry and demyelinating disease, but highlighted a different sequence (yvkqstlkl) in that discussion. (*Id*. at 20 (citing Silva Markovic-Plese et al., *High Level of Cross-Reactivity in Influenza Virus Hemagglutinin-Specific CD4+ T-Cell Response: Implications for the Initiation of Autoimmune Response in Multiple Sclerosis*, 169 J. NEUROIMMUNOLOGY 31 (2005) (Ex. 110, Tab A); Kai W. Wucherpfennig & Jack L. Strominger, *Molecular Mimicry in T Cell-Mediated Autoimmunity: Viral Peptides Activate Human T Cell Clones Specific for Myelin Basic Protein*, 80 CELL 695 (1995) (Ex. 110, Tab O)).) But in any event, Dr. Akbari does not appear to view these sequence matches as important. He opines that molecular mimicry has been shown to occur even in the absence of sequence or structural homology due to degeneracy and also suggests that more recent thinking looks to human leukocyte antigen (HLA) molecules, rather than protein peptide sequences, as having cross-reactive potential. (*Id*. at 21.) However, he ultimately concludes that the mimics he identified "support the notion and describe how influenza vaccine can induce immune responses, which are often associated with induction of neuropathology." (*Id*. at 22.)

Thus, Dr. Akbari summarizes his theory of causation as follows:

---

[14] Dr. Akbari caused some confusion in his report at page 22, wherein he stated that "[p]revious discussions in my previous report highlighted that the flu vaccines can trigger autoreactive T cells against small fibers, both lightly myelinated and unmyelinated." (Ex. 107, p. 22.) Because Dr. Akbari had not filed a prior report in this case, this caused Dr. Jameson to express confusion and state that Dr. Akbari did not cite any literature to support this point. (Ex. E, p. 12.) Thus, he concluded "it is not possible to evaluate the strength of this bold and very specific assertion." (*Id.*) However, despite the reference to a prior report, I assume for purposes of this decision that Dr. Akbari intended to reference back to the prior section of his report titled "Influenza vaccine is capable of stimulating autoreactive T cells," which did include discussion of Dr. Akbari's assertion that the flu vaccine can cause demyelinating disease via molecular mimicry. (Ex. 107, p. 20.) Notably, however, to Dr. Jameson's point, it is not clear how this discussion would extend to unmyelinated fibers.

> I have demonstrated numerous ways in which the scientific evidence supports the idea that the induction of inflammasome, coupled with molecular mimicry, serves as the mechanism through which an immune-stimulated response to the flu vaccination could lead to peripheral neuropathy and subsequent symptoms, including SFN.

(Ex. 107, p. 28.)

However, Dr. Akbari also otherwise stresses a critical role for modulation of regulatory T cells in the loss of self-tolerance and the induction of autoimmunity, stressing in particular that alteration of regulatory T cells is associated with the severity and clinical manifestations of SFN. (Ex. 107, pp. 7-8, 20 (citing Samuel L. Duffy, *The Role of Regulatory T Cells in Nervous System Pathologies*, 96 J. NEUROSCI. RSCH. 951 (2018) (Ex. 109, Tab H); Simon Glatigny et al., *Integrin Alpha L Controls the Honing of Regulatory T Cells During CNS Autoimmunity in the Absence of Integrin Alpha 4*, 5 SCI. REPS. 1 (2015) (Ex. 109, Tab L)).) Although Dr. Akbari broadly stated that "[g]enetic changes of molecules that influence Treg generation or activation, the timing of infection or vaccination, and the magnitude of inflammation are recognized in the literature as additional factors involved in the exacerbation of autoimmunity" (*Id*. at 7), the accompanying citation does not discuss vaccinations (Christian Dejaco et al., *Imbalance of Regulatory T Cells in Human Autoimmune Diseases*, 117 IMMUNOLOGY 289 (2005) (Ex. 109, Tab G)). Thus, Dr. Akbari raises dysregulation of regulatory T cells as an explanation for chronic autoimmunity in SFN without implicating the flu vaccine as a cause of such dysregulation.[15] In that regard, while seeking to discount diabetes as a likely cause of petitioner's SFN, Dr. Akbari stresses the roles of genetic and environmental factors in the development of SFN. (*Id*. at 25-27.) He states:

> A crucial question arises: what factors contribute to the attenuation of immune tolerance? The answer typically encompasses two primary facets: environmental and genetic factors. Host susceptibility to autoimmune disease development significantly influences neuropathy, irrespective of the initiating pathological cause. The role of genetics in predisposing individuals to neuropathy is consistently expanding.

(*Id*. at 25.)

[15] In a prior case involving a different condition (rheumatoid arthritis), Dr. Akbari did more explicitly seek to argue that a vaccine-induced increase in effector Th17 cells would contribute to a decrease in regulatory T cells. *Cote v. Sec'y of Health & Human Servs*., No. 18-1350V, 2026 WL 1555934, at *24 (Fed. Cl. Spec. Mstr. Mar. 27, 2026), *mot. for rev. filed*, No. 18-1350V (Fed. Cl. Apr. 27, 2026). However, even assuming *arguendo* that he intended to invoke the same argument in this case, Dr. Akbari did not substantiate in *Cote* that the vaccination would throw off the homeostasis between regulatory and effector T cells. *Id*.

ii. Report by Respondent's Immunologist, Stephen Jameson, Ph.D.[16]

Dr. Jameson notes that much of Dr. Akbari's report is dedicated to a far-ranging discussion of the elements of innate and adaptive immune responses that can lead to autoimmunity in some circumstances, but with little that would speak to the specific immune response expected following the flu vaccination at issue in this case. (Ex. E, p. 3.) He stresses that vaccinations are not interchangeable. (*Id.*) Moreover, he stresses that the same processes that can lead to autoimmunity are also the same processes that contribute to a protective immune response. (*Id*. at 4.) Therefore, "stating that certain cell types, processes or soluble factors are involved in both responses to a vaccine *and* an immunopathological response is completely fair – but to say that one of those responses leads to the other, based purely on similarities of the immune components involved, is not at all justifiable." (*Id.*)

Dr. Jameson explains that inflammasomes are a set of proteins that sense pathogens or cellular damage and induce a pro-inflammatory innate immune response. (Ex. E, p. 4.) This response leads to assembly of large protein complexes and cellular signaling cascades that release pro-inflammatory cytokines, such as IL-1 and IL-18. (*Id*. (citing Haitao Guo et al., *Inflammasomes: Mechanisms of Action, Role in Disease, and Therapeutics*, 21 NATURE MED. 677 (2015) (Ex. E, Tab 2); Katherine C. Barnett et al., *A 360º View of the Inflammasome: Mechanisms of Activation, Cell Death, and Diseases*, 186 CELL 2288 (2023) (Ex. E, Tab 3); Katherine A. Deets & Russell E. Vance, *Inflammasomes and Adaptive Immune Responses*, 22 NATURE IMMUNOLOGY 412 (2021) (Ex. E, Tab 4)).) It is only one of multiple different ways in which inflammatory responses are activated. (*Id*.) Although Dr. Akbari stresses that influenza infection induces inflammasome activation, this is not controversial and shows inflammasomes are a natural and physiologically useful component of the protective immune response. (*Id*. at 4-5 (citing Paul G. Thomas et al., *The Intracellular Sensor NLRP3 Mediates Key Innated and Healing Responses to Influenza A Virus Via the Regulation of Caspase-1*, 30 IMMUNITY 566 (2009) (Ex. E, Tab 5); Takeshi Ichinohe et al., *Inflammasome Recognition of Influenza Virus Is Essential for Adaptive Immune Responses*, 206 J. EXPERIMENTAL MED. 79 (2009) (Ex. E, Tab 6); Irving C. Allen et al., *The NLRP3 Inflammasome Mediates In Vivo Innate Immunity to Influenza A Virus Through Recognition of Viral RNA*, 30 IMMUNITY 556 (2009) (Ex. E, Tab 7); Takeshi Ichinoke et

[16] Dr. Jameson received his Ph.D. from the University of Cambridge in England in 1998, before going on to complete a post-doctoral fellowship in immunology at Scripps Research Institute in California in 1990, followed by an additional postdoctoral fellowship in immunology at the University of Washington in Seattle, Washington, in 2005. (Ex. F, p. 1; Ex. E, p. 2.) He then established his own laboratory at the University of Minnesota, where he also began working as an assistant professor of immunology in 1995. (Ex. F, p. 1; Ex. E, p. 2.) He was eventually elevated to professor in 2006. (Ex. F, p. 1.) In his research capacity, Dr. Jameson has "published over 130 primary research papers and over 50 review articles, nearly all on aspects of immunology and the immune response to pathogens." (Ex. E, p. 2.) His research has focused on the "application of animal models to study the cellular immune responses against pathogens and vaccines, and the impact of these responses on protective immunity, immunopathology and autoimmunity." (*Id.*)

al., *Influenza Virus Activates Inflammasomes Via Its Intracellular M2 Ion Channel*, 11 NATURE IMMUNOLOGY 404 (2016) (Ex. E, Tab 8)).) Dr. Jameson also agrees with Dr. Akbari's assertion that the flu vaccine can activate inflammasomes or can at least lead to production of IL-1β.[17] (*Id*. at 5-6.) However, because inflammasome activation is an expected part of a healthy immune response, merely citing the fact that the flu vaccine can activate inflammasomes does not imply that it is "a harbinger of imminent immunopathology or autoimmune disease." (*Id*. at 6.) Moreover, although Dr. Jameson agrees that inflammasome activation can lead to bioactive 1L-1β, he asserts that Dr. Akbari's assertion that IL-6 and TNF-α are induced by the inflammasome, which Dr. Akbari had indicated are also crucial to differentiation into Th17 cells, is not supported. Thus, Dr. Akbari is not correct to suggest that activation of inflammasome is an "automatic indicator of subsequent Th17 generation." (*Id.* at 7 (citing Barnett et al., *supra*, at Ex. E, Tab 3; Deets & Vance, *supra*, at Ex. E, Tab 4).) For example, activation of inflammasome has also been shown to generate Th1 or Th2 responses, including in the context of influenza infection, in which inflammasome deficiency has been shown to lead to a loss of a protective Th1 response. (*Id*. (citing Deets & Vance, *supra*, at Ex. E, Tab 4; Ichinohe et al., *supra*, at Ex. E, Tab 8; Ekaterina Martynova et al., *Inflammasome Contribution to the Activation of Th1, Th2, and Th17 Immune Responses*, 13 FRONTIERS MICROBIOLOGY 1 (2022) (Ex. E, Tab 10)).) Dr. Jameson does not agree that the sources cited by Dr. Akbari otherwise indicate that the flu vaccine produces a robust Th17 response (*Id*. at 8-9); however, he suggests that he is "willing to keep an open mind" on that point, pending meaningful evidence (*Id*. at 10).

But in any event, Dr. Jameson does not agree that the Th17 immune response is a driver of SFN. (Ex. E, pp. 10-11.) He explains that, although Dr. Akbari cited several papers for the proposition that elevated levels of Th17 cells are found in patients with neuropathologic conditions, none of these papers involve SFN. Instead, they address myasthenia gravis, Guillain-Barré Syndrome, and multiple sclerosis. (*Id*. at 10-11 (citing Dalakas, *supra*, at Ex. 109, Tab F; Li et al., *supra*, at Ex. 109, Tab X; Zambrano-Zaragoza et al., *supra*, at Ex. 110, Tab S).) Additionally, Dr. Jameson does not agree that Sun et al., a rat study inducing IL-17 by spinal nerve ligation, is reasonably informative, and Ryabkova et al., a review article regarding post-HPV vaccine neuroinflammation, provided no indication that the vaccination induced a Th17 response and, in any event, involved a different vaccine. (*Id*. (citing Sun et al., *supra*, at Ex. 110, Tab J; Ryabkova et al., *supra*, at Ex. 110, Tab E).)

Dr. Jameson charges that Dr. Akbari's opinion asserts a sweeping generalization. (Ex. E, pp. 10-11.) Stressing that T cells and B cells have specificity for the antigens to which they respond, he asserts that

---

[17] For reasons that do not need to be explained, Dr. Jameson is critical of Dr. Akbari's citation to studies that implicate a specific protein, KSHV, in the activation of inflammasomes because that protein is not in any commercially available flu vaccine. (Ex. E, p. 5.) However, citing other sources, he agrees with Dr. Akbari's ultimate conclusion even as he disagrees with how Dr. Akbari reached it. (*Id*. at 6.)

> it is not reasonable to suggest that because a) Th17 cells (may) arise following influenza vaccination and because b) Th17 cells (may) contribute to SFN then, ipso facto: c) a Th17 response to influenza leads to SFN. After all, impressive Th17 responses are elicited by various natural infections (with commonly encountered fungal pathogens such as candida, and various extracellular bacteria), and clearly those immune responses do not systemically lead to autoimmune neuropathology.

(*Id*. (endnotes omitted).)

Dr. Jameson asserts that Dr. Akbari has not supported his "bold and very specific" assertion that the flu vaccine has been shown to drive autoreactivity against lightly myelinated and unmyelinated small fibers. (Ex. E, p. 12.) Most of the case reports he cited for the proposition that vaccines can cause SFN did not involve the flu vaccine. (*Id*. at 12-13.) Only the case report by Hull et al. involved a case of post-flu vaccine neuropathy; however, that case involved a vasculitic neuropathy, which is not petitioner's condition. (*Id*. at 13 (discussing Hull et al., *supra*, at Ex. 109, Tab O).) Moreover, although Dr. Akbari cites some papers discussing potential cross-reactivity between influenza proteins and myelin basic protein, a point Dr. Jameson considers "still hotly debated," that literature is of little significance given that "the specific characteristics of SFN indicate that a response to myelin is *not* typically involved." (*Id*. at 16 (citing Lisette R.M. Raasing et al., *Current View of Diagnosing Small Fiber Neuropathy*, 8 J. NEUROMUSCULAR DISEASES 185 (2021) (Ex. E, Tab 22); Lacomis, *supra*, at Ex. A, Tab 18).) Additionally, Dr. Jameson is critical of Dr. Akbari's contention that molecular mimicry can be asserted even in the absence of any homology, stressing that

> [t]his effectively provides carte blanche to link *any* two adaptive immune responses, regardless of their specificity. . . . In the context of vaccine-related injury, this argument would allow one to conclude that an immune response to *any* vaccine is a candidate for causing *any* autoimmune or immunopathogenic diseases, and that such mimicry would be unpredictable and, in practice, impossible to verify.

(*Id*. at 14.) However, even when there is mimicry between foreign and self antigens, that does not automatically indicate that it will provoke autoimmune pathology. (*Id.*)

## V. Analysis[18]

### a. *Althen* prong one

Under *Althen* prong one, petitioner must provide a "reputable medical theory," showing that the subject vaccine can cause the type of injury alleged. *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355-56 (Fed. Cir. 2006) (quoting *Pafford v. Sec'y of Health & Human Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. denied*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006)). Such a theory need only be "legally probable, not medically or scientifically certain." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994). Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325-26 (Fed. Cir. 2006)). However, "[a] petitioner must provide a 'reputable medical or scientific explanation' for [the proposed causal] theory. While it does not require medical or scientific certainty, it must still be 'sound and reliable.'" *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (citation omitted) (first quoting *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010); then quoting *Knudsen*, 35 F.3d at 548-49). That is,

---

[18] In her motion reply, petitioner suggests that respondent has challenged the diagnosis of SFN due to his assertion that petitioner's neuropathy represents a metabolic neuropathy caused by her diabetes. (ECF No. 87, pp. 2, 5, 8-9.) Petitioner argues that respondent has misapplied *Broekelschen v. Secretary of Health & Human Services*, 618 F.3d 1339, 1346 (Fed. Cir. 2010). (*Id*. at 8.) Whereas petitioner argues that *Broekelschen* requires that a disputed diagnosis be resolved prior to engaging in an analysis of causation-in-fact, respondent, she asserts, sought to suggest under *Althen* prong two that any diagnostic uncertainty defeats causation. (*Id*.) Petitioner argues "[t]he correct legal framework allows the Court to find that Petitioner suffers from small fiber neuropathy, even if Respondent disputes its label or origin, so long as the condition is shown by a preponderance of the evidence to exist and to have a post-vaccination onset." (*Id.* at 8.) Petitioner's argument appears to misconstrue respondent's position in this case. Respondent has not contested that petitioner has SFN. (E.g., ECF No. 82, n. 17 (stating that "a review of the reports indicates that all the experts now agree, consistent with Dr. Spain's opinion throughout, that petitioner has SFN and that SFN is the relevant disease here").) Instead, respondent argued with respect to *Althen* prong two that "there is ample evidence that her SFN predated her vaccination and was likely caused by her pre-existing health conditions . . . diabetes is the leading cause of peripheral neuropathy in the United States, with 60-70% of diabetics experiencing neuropathy, *and diabetes is a known cause of SFN* (which is one type of peripheral neuropathy), accounting for up to 25% of SFN cases in one study." (*Id*. at pp. 59-60 (footnote omitted) (emphasis added).) Thus, because it is undisputed that petitioner suffered SFN, a threshold *Broekelschen* analysis is not necessary and the argument raised by respondent is appropriately addressed under *Althen* prong two. The Federal Circuit has explained that "evidence of other possible sources of injury can be relevant not only to the 'factors unrelated' defense, but also to whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question." *Stone v. Sec'y of Health & Human Servs*., 676 F.3d 1373, 1379-80 (Fed. Cir. 2012) (citing *de Bazan v. Sec'y of Health & Human Servs*., 539 F.3d 1347, 1353 (Fed. Cir. 2008), as noting the government may submit evidence to demonstrate the inadequacy of petitioner's evidence)); *see also Winkler v. Sec'y of Health & Human Servs.*, 88 F4th 958, 963 (Fed. Cir. 2023) (applying *Stone*, 676 F.3d 1373).

although petitioners are not required to prove their theories in any one way, they must in all events support their proffered theory with sound and reliable scientific explanation, *Boatmon*, 941 F.3d at 1359, and provide evidence that establishes on balance that the vaccine at issue can more likely than not cause the injury at issue, *Cerrone v. Sec'y of Health & Human Servs.*, 146 F.4th 1113, 1120-23 (Fed. Cir. 2025).[19]

Petitioner argues that Dr. Akbari's opinion and supporting materials preponderantly support a theory of causation whereby the flu vaccine can cause SFN. (ECF No. 80, p. 66; *see also* ECF No. 87, pp. 19-23.) Noting that the small fibers include both myelinated fibers and unmyelinated fibers, petitioner relies on Dr. Akbari's opinion that the flu vaccine includes hemagglutinin that shares structural or sequence similarity to human proteins contained in myelin. (ECF No. 80, p. 67 (citing Ex. 107, pp. 10-11, 20-21, 25).) Thus, petitioner argues that damage to both myelinated and unmyelinated nerve fibers can result from autoimmune attack against the myelin fibers resulting from this molecular mimicry. (*Id.*) She also argues that she has demonstrated that Th17 cells and inflammasomes are activated by the flu vaccine and that, coupled with dysregulation of regulatory T cells, they help to explain how an immune-mediated injury to the small fiber nerves can occur. (*Id*. at 68; *see also* ECF No. 87, pp. 19-23.) Petitioner asserts that Th17 cells, in particular, are associated with inflammation and neuropathy of the small nerve fibers. (ECF No. 80, p. 68.) Petitioner notes that Dr. Akbari cited multiple case reports of post-vaccination SFN and that these papers support that activation of inflammasomes was present. (*Id*. at 69.) Petitioner stresses that, although they are by their nature anecdotal, case reports are peer-reviewed literature and valuable evidence. (*Id*. at 64-66.) Petitioner argues that the innate and adaptive immune processes identified by Dr. Akbari work in conjunction with genetic and environmental factors, resulting in a sound and reliable theory causally relating the flu vaccine to the onset of SFN. (*Id*. at 69-70.) Petitioner suggests that, by contrast, the experts proffered by respondent in this Program typically seek to elevate petitioner's burden to scientific certainty. (*Id*. at 63-64.)

Respondent disputes that his experts have demanded scientific certainty. (ECF No. 82, n. 18.) He argues that the case reports filed by petitioner regarding post-vaccination SFN are distinguishable. (*Id*. at 42-43.) In particular, none involved the flu vaccine. (*Id*. at 43-44.) Moreover, case reports are in any event only weak evidence. (*Id.* at 44.) Respondent stresses the lack of epidemiology, as had been observed by the IOM in its 2012 report.[20] (*Id*. at 44-45.) And, although petitioner purported to present

[19] In the motion papers, petitioner argued that a showing of biologic plausibility can support a finding of causation. (ECF No. 80, p. 57-60.) Respondent subsequently filed a Notice of Supplemental Authority raising the fact of the Federal Circuit's holding in *Cerrone*. On that point, I note that *Cerrone* did not announce a new standard. As noted in respondent's motion response (ECF No. 82, n. 16), the Federal Circuit has long held that a plausible theory of causation is insufficient in this Program. *Cerrone*, 146 F.4th at 1121 (quoting *LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) for the proposition that "we have repeatedly stated that 'simply identifying a "plausible" theory of causation is insufficient for a petitioner to meet her burden of proof'").

[20] Although respondent raises other points that are well taken, this particular argument misses the mark. Respondent argues that "[w]hile Dr. Willer and petitioner attempt to discount the value of epidemiological evidence, they offer no valid reason to question the fact that professional researchers routinely design

mechanistic evidence via Dr. Akbari, Dr. Akbari's report is largely devoted to broader discussions of the immune system and SFN with no reliable evidence of a causal relationship between the flu vaccine and SFN. (*Id*. at 46-47.) Moreover, he argues that Dr. Akbari's discussions of inflammasomes, Th17, and molecular mimicry are flawed in several respects. (*Id*. at 47-52.)

Some prior petitioners have been compensated for SFN that followed vaccination, including flu vaccinations.[21] However, petitioners have not consistently been able to demonstrate that vaccinations can cause SFN.[22] I have concluded in two

---

studies that are appropriately powered, take into account relevant factors, including population sizes, and provide statistically significant information regarding rare events." (ECF No. 82, pp. 44-45 (internal citations omitted).) However, respondent then goes on to acknowledge that the IOM observed in its review that no studies had been identified that examined whether the flu vaccine poses a risk of SFN. (*Id*. at 45.) He then argues that "[t]his dearth of studies over the course of years is likely due to the fact that, as noted, there are no case reports of SFN following vaccination, meaning that there is not even a signal worth investigating with epidemiological studies – a signal that would likely require, at the very least, a significant number of case reports." (*Id*.) Even if having a seeming logic to it, respondent's argument is speculative and, in any event, cannot be credited. While the Federal Circuit has expressed that special masters are not required "to ignore probative epidemiological evidence that undermines petitioner's theory," *D'Tiole v. Sec'y of Health & Human Servs.*, 726 F. App'x 809, 811 (Fed. Cir. 2018), it has also been explained that requiring petitioners to produce epidemiologic evidence would be inconsistent with the allowance of circumstantial evidence as permitted under *Althen*, *Capizzano*, 440 F.3d at 1325. Here, respondent does not actually point to any epidemiology that undermines petitioner's theory, but merely suggests that the lack of any relevant epidemiologic study should in itself weigh against petitioner's claim. That clearly seeks to elevate petitioner's burden of proof. Indeed, not even the IOM report cited by respondent supports respondent's reasoning. Faced with a lack of available epidemiology, the IOM concluded only that "[t]he evidence is inadequate to accept or reject a causal relationship between influenza vaccine and small fiber neuropathy," which they explained is a position of neutrality that does not imply the lack of evidence either favors or disfavors the safety of the vaccine, noting the adage that "absence of evidence is not evidence of absence." (citing INST. OF MED., ADVERSE EVENTS OF VACCINES: EVIDENCE AND CAUSALITY 14, 23, 341 (Kathleen Stratten et al. eds., 2012) [hereinafter 2012 IOM Report], https://www.nationalacademies.org/read/13164 (last visited July 23, 2026).) Although respondent filed only an excerpt of the 2012 IOM Report (INST. OF MED., ADVERSE EVENTS OF VACCINES: EVIDENCE AND CAUSALITY (Kathleen Stratten et al. eds., 2012) (Ex. E, Tab 1)), he cited the complete report via hyperlink in his motion response. (ECF No. 82, pp. 44-45 (citing "Adverse Effects of Vaccines: Evidence and Causality. Washington, DC: The National Academies Press: 2012: 340-41 (available at https://nap.nationalacademies.org/catalog/13164) (last visited Apr. 15, 2025)").

[21] *E.g.*, *Johnson v. Sec'y of Health & Human Servs*., No. 16-1630V, 2024 WL 5349150 (Fed. Cl. Spec. Mstr. Dec. 30, 2024) (hepatitis A/B vaccine); *Coons v. Sec'y of Health & Human Servs*., No. 20-1067V, 2024 WL 1741619 (Fed. Cl. Spec. Mstr. Mar. 29, 2024) (tetanus diphtheria toxoid vaccine); *Quirino v. Sec'y of Health & Human Servs.*, No. 17-989V, 2023 WL 9229145 (Fed. Cl. Spec. Mstr. Dec. 18, 2023) (hepatitis B vaccine); *Fiske v. Sec'y of Health & Human Servs*., No. 17-1378V, 2023 WL 8352761 (Fed. Cl. Spec. Mstr. Nov. 13, 2023) (flu vaccine); *E.M. v. Sec'y of Health & Human Servs.*, No. 14-753V, 2021 WL 3477837 (Fed. Cl. Spec. Mstr. July 9, 2021) (flu vaccine); *Swaiss v. Sec'y of Health & Human Servs*., No. 15-286V, 2019 WL 6520791 (Fed. Cl. Spec. Mstr. Nov. 4, 2019) (Tdap vaccine).

[22] *Kelsey v. Sec'y of Health & Human Servs.*, No. 20-850V, 2026 WL 622782 (Fed. Cl. Spec. Mstr. Feb. 10, 2026) (finding that the petitioner had not presented a reliable theory for explaining how the flu vaccine can cause SFN within one day of vaccination); *Fantini v. Sec'y of Health & Human Servs.*, No. 15-1332V, 2022 WL 1760730, at *21-23 (Fed. Cl. Spec. Mstr. May 2, 2022) (finding that the petitioner had not preponderantly demonstrated that SFN was his correct diagnosis, nor had he presented a sound and reliable theory demonstrating that the flu vaccine can cause SFN); *Todd v. Sec'y of Health & Human*

prior cases that the capacity of the flu vaccine to cause SFN was not preponderantly demonstrated. *McGill v. Sec'y of Health & Human Servs.*, No. 15-1485V, 2023 WL 3813524, at *24-30 (Fed. Cl. Spec. Mstr. May 11, 2023) (finding that the petitioner had not preponderantly demonstrated that either the 13-valent pneumococcal conjugate vaccine or the flu vaccine can cause SFN); *Sonnenburg v. Sec'y of Health & Human Servs.*, No. 18-1235, 2026 WL 2032343, at *21-27 (Fed. Cl. Spec. Mstr. June 9, 2026), *mot. for rev. filed*, No. 18-1235 (Fed. Cl. July 9, 2026). In another prior case, I found that the petitioner had provided sufficient evidence to implicate the hepatitis B vaccine as a cause of the petitioner's SFN. *Quirino*, 2023 WL 9229145, at *19-24. In that case, as in this case, the petitioner did rely in part on an analogy to GBS. *Id*. at *19-20. However, unlike this case, petitioner's theory of causation remained unrebutted in significant respects. *Id*. at *20. Moreover, the *Quirino* petitioner provided unrebutted expert opinion establishing that the hepatitis B vaccine can cause polyarteritis nodosa, which itself is known to cause SFN. *Id*. at *21. In this case, there are several reasons why I do not find the specific theory Dr. Akbari advanced to be sound and reliable. These reasons touch on all of the various immune mechanisms Dr. Akbari discusses, including inflammasome activation, Th17 immune response, and molecular mimicry.

First, I am not persuaded by Dr. Akbari's discussion of molecular mimicry. Although he purports to have identified a relevant homology (fyknli compared to ffkniv), he has not adequately explained how he identified those sequences and, though he cited literature for the proposition that the degree of homology he identified can be significant as a general matter, he has not provided any support for the proposition that the specific sequences he identified are likely to be immunologically significant. As Dr. Jameson explained, homology occurs often without being pathogenic. (Ex. E, pp. 13-14.) Accordingly, it is well established in this Program that homology standing alone does not reasonably support a theory based upon molecular mimicry. *Tullio v. Sec'y of Health & Human Servs.*, No. 15-51V, 2019 WL 7580149, at *15 (Fed. Cl. Spec. Mstr. Dec. 19, 2019), *aff'd*, 149 Fed. Cl. 448 (2020); *see also Caredio ex rel. D.C. v. Sec'y of Health & Human Servs.*, No. 17-0079V, 2021 WL 4100294, at *31 (Fed. Cl. Spec. Mstr. July 30, 2021) ("[D]emonstration of homology alone is not enough to establish a preponderant causation theory." (emphasis omitted) (citing *Schultz v. Sec'y of Health & Human Servs.*, No. 16-539V, 2020 WL 1039161, at *22 n.24 (Fed. Cl. Spec. Mstr. Jan. 24, 2020))), *mot. for rev. denied*, 2021 WL 6058835 (Fed. Cl. Dec. 3, 2021). Moreover, I agree with Dr. Jameson's criticisms of Dr. Akbari's attempt to rely on degeneracy to suggest that it is not even necessary to make any kind of showing as to a relevant homology. (Ex. E, p. 14.) It is far too broad and unverifiable of a suggestion. In fact, I have previously rejected substantially the same argument in a prior case alleging that the flu vaccine caused SFN. *McGill*, 2023 WL 3813524, at *29 (explaining that "the degeneracy concept might suggest that it is less important to demonstrate a specific homology in those cases where some other evidence suggests that a vaccine can cause a particular autoimmune injury," but finding that "[i]n the absence of some

---

*Servs.*, No. 15-860V, 2020 WL 727973, at *21-22 (Fed. Cl. Spec. Mstr. Jan. 8, 2020) (finding that the petitioner did not preponderantly establish that she suffered from SFN or that the flu vaccine can cause SFN).

evidence specific to SFN, accepting T cell degeneracy as the primary support for Dr. Tornatore's opinion would mean effectively accepting that anything is possible").

Dr. Akbari did otherwise cite two papers for the proposition that hemagglutinin from influenza has the capacity to generate autoreactive T cells that cause demyelination. (Ex. 107, p. 20 (citing Markovic-Plese et al., *supra*, at Ex. 110, Tab A; Wucherpfennig & Strominger, *supra*, at Ex. 110, Tab O).) However, neither of these papers involved SFN, the condition that is at issue in this case. Petitioner suggests that evidence pertaining to demyelinating conditions is relevant to SFN because at least some of the small fibers are lightly myelinated (ECF No. 80, p. 67), but Dr. Jameson explains that an immune attack against myelin is considered an unlikely pathogenesis for SFN. (Ex. E, p. 16.) Specifically, he cited literature explaining that "[t]he exact pathophysiology of isolated SFN is unknown. However, since demyelinating processes do not solely affect small nerve fibers, it is unlikely that this would be the underlying pathogenesis." (Raasing et al., *supra*, at Ex. E, Tab 22, p. 2.) Instead, axonal loss or neuronal degermation are considered more likely causes. (*Id*.; *see also* Lacomis, *supra*, at Ex. A, Tab 18, p. 7 (also indicating axonal loss is a more likely cause of SFN than demyelination and noted four features of SFN that are consistent with unmyelinated fiber pathology).) Ultimately, Dr. Akbari has not substantiated his assertion that a demyelinating process is a likely cause of SFN, rendering his molecular mimicry presentation based on myelin basic protein irrelevant.

Second, I am also persuaded by Dr. Jameson's explanation that Dr. Akbari's reliance on inflammasome activation as a generator of a Th17 immune response appears unreliable. While there is no dispute that the flu vaccine can active inflammasome, Dr. Jameson reasonably points out that while Dr. Akbari specifically identified three different cytokines (IL-1β, IL-6, and TNF-α) as "crucial" to the development of a Th17 response, he has only supported the notion that one of the three (IL-1β ) is produced by activation of inflammasome after flu vaccination. (Ex. E, p. 7.) Thus, by Dr. Akbari's own description of the process, he has not substantiated that inflammasome activation by the flu vaccine would result in a shift to a Th17 immune response. And, indeed, Dr. Jameson has also cited literature suggesting that activation of inflammasome can otherwise lead to Th1 and Th2 shifts. (*Id*. (citing Deets & Vance, *supra*, at Ex. E, Tab 4; Ichinohe et al., *supra*, at Ex. E, Tab 8; Martynova et al., *supra*, at Ex. E, Tab 10).) I have considered that Dr. Akbari also cited two other publications as direct evidence of the proposition that flu infection and flu vaccination can increase IL-17 and Th17 cells. (Ex. 107, p. 19 (citing Bermejo-Martin et al., *supra*, at Ex. 109, Tab B; Lin et al., *supra*, at Ex. 109, Tab Y).) However, Dr. Jameson is persuasive in questioning the value of those publications relative to Dr. Akbari's theory. (Ex. E, p. 8.) Specifically, he explained that Bermejo-Martin et al. observed elevated IL-17 levels among hospitalized patients suffering from severe pandemic influenza infection, but did not observe a Th17 response among outpatients suffering the same type of infection, undercutting the notion that the immune response to vaccination would result in a Th17 response. (*Id*. (discussing Bermejo-Martin et al., *supra*, at Ex. 109, Tab B).) The Lin paper examined two prior publications regarding an experimental vaccine administered to mice that was specifically intended to artificially boost Th17 generation. (*Id*.

(discussing Lin et al., *supra*, at Ex. 109, Tab Y).) Accordingly, these studies do not include findings that are readily transferrable to the context of an immune response following a routine seasonal flu vaccination.

Third, I am not persuaded that Dr. Akbari has demonstrated that the Th17 immune response can lead to SFN. Again, Dr. Jameson repeatedly stressed that simply identifying inflammasomes and Th17 immune responses as working parts of the natural immune response does not imply that they are pathogenic without more. As another special master has repeatedly noted, petitioners often seek unpersuasively "to convert the intended effect of vaccination, and/or a vaccine's understood capacity to provoke some immune response, into something pathogenic, but without sufficient probative evidence to connect all the dots." *Eberline v. Sec'y of Health & Human Servs*., No. 23-655V, 2025 WL 3852456, at *17 (Fed. Cl. Spec. Mstr. Dec. 1, 2025) (citing *Palattao v. Sec'y of Health & Human Servs.*, No. 13-591V, 2019 WL 989380, at *36 (Fed. Cl. Spec. Mstr. Feb. 4, 2019), *mot. for rev. denied*, 2026 WL 1746434 (Fed. Cl. May 26, 2026)). As in such prior cases, even if Dr. Akbari has accurately summarized some of the steps underlying his theory, he has not adequately substantiated that Th17 is ultimately pathogenic of SFN. Dr. Akbari cited review paper by Zambrano-Zaragoza et al., exploring the role of Th17 in autoimmune disease (Zambrano-Zaragoza et al., *supra*, at Ex. 110, Tab S); however, that paper did not identify SFN, or any peripheral neuropathy, as being among the conditions for which Th17 is potentially implicated.

Dr. Akbari also cited two additional papers to more specifically show that Th17 cells can contribute to SFN. (Ex. 107, p. 19 (citing Sun et al., *supra*, at Ex. 110, Tab J; Ryabkova et al., *supra*, at Ex. 110, Tab E).) However, Dr. Jameson reasonably questions the probative value of these papers. Sun et al. experimentally produced a transient elevation in IL-17 by spinal nerve ligation. This is of questionable significance for two related reasons. First, Dr. Akbari specifically notes that this study showed Th17 cells acting on astrocytes (*Id.* at 19), but astrocytes are specific to the central, rather than peripheral, nervous system. Second, and relatedly, the Sun study purports to be significant to the pathogenesis of neuropathic pain in multiple sclerosis, a central nervous system disorder. (Sun et al., *supra*, at Ex. 110, Tab J, p. 1.) This is consistent with Zambrano-Zargoza review paper, which identified multiple sclerosis, but not peripheral neuropathies, as an area of interest in Th17 autoimmunity. (Zambrano-Zaragoza et al., *supra*, at Ex. 110, Tab S, p. 4.) Ryabkova et al. is uninformative for similar reasons. Ryabkova et al. examined the pathophysiology of fibromyalgia, which is a systemic symptom-based condition, rather than a peripheral pain disease, discussing three distinct mechanisms – autoimmunity, neuroinflammation, and small fiber neuropathy. (Ryabkova et al., *supra*, at Ex. 110, Tab E, p. 1.) In discussing the neuroinflammatory mechanism as an explanation for fibromyalgia as a centralized pain state, the paper noted that one potential treatment acted in part by inhibiting IL-17, which implied a Th17 immune response was implicated in central nervous system neuroinflammation leading to fibromyalgia. (*Id*. at 3.) However, in discussing SFN as a separate explanation for fibromyalgia symptoms, the authors distinguished an immune-mediated peripheral trigger from central nervous system neuroinflammation. (*Id*. at 5.)

The discussion of an immune-mediated peripheral neuropathy, which is what is at issue in this case given petitioner's biopsy, did not include any discussion of Th17. (*Id.*)

Finally, I have also considered whether the case reports cited by both Dr. Willer and Dr. Akbari provide additional meaningful evidence of a causal relationship between the flu vaccine and SFN. Petitioners in this Program often highlight the usefulness of case reports in cases of rare diseases or unusual occurrences. *E.g.*, *Patton v. Sec'y of Health & Human Servs.*, 157 Fed. Cl. 159, 166-68 (2021). However, case reports "do not purport to establish causation definitively, and this deficiency does indeed reduce their evidentiary value," even though they are not entirely devoid of evidentiary value. *Paluck ex rel. Paluck v. Sec'y of Health & Human Servs.*, 104 Fed. Cl. 457, 475 (2012) (quoting *Campbell v. Sec'y of Health & Human Servs.*, 97 Fed. Cl. 650, 668 (2011)). Based on my review of the specific case reports filed in this case, they are insufficient to carry petitioner's burden of proof. As respondent has stressed, most involved a different vaccination. And although Dr. Akbari sought to suggest that the case reports regarding various vaccines established a "common denominator" in the pathogenesis of a post-vaccinal SFN (Ex. 107, p. 25), this is not very significant in light of Dr. Akbari's failure to preponderantly support a role for the flu vaccine in that pathogenesis. Additionally, respondent's experts have persuasively noted that the one case report that did involve the flu vaccine (Hull et al., *supra*, at Ex. 109, Tab O) is distinguishable in that it presented a vasculitic neuropathy. (Ex. C, pp. 6-7; Ex. E, p. 13.) Ultimately, none of the publications provide any useful data beyond a purported temporal association. However, "single case reports of Disease X occurring after Factor Y . . . do not offer strong evidence that the *temporal* relationship is a *causal* one—the temporal relationship could be pure random chance." *Crutchfield v. Sec'y of Health & Human Servs.*, No. 09-0039V, 2014 WL 1665227, at *19 (Fed. Cl. Spec. Mstr. Apr. 7, 2014), *aff'd*, 125 Fed. Cl. 251 (2014).

Nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Isaac v. Sec'y of Health & Human Servs.*, No. 08-601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for rev. denied*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x 999 (Fed. Cir. 2013). Here, respondent and his expert are persuasive in contending that much of Dr. Akbari's opinion reflects extended discussion of immune concepts that could provide some context for a well-supported theory, but that are not themselves probative of the causal relationship petitioner seeks to show. And while such a discussion could *potentially* provide some foundation for a legally probable theory of causation, Dr. Akbari's specific assertions regarding the immune process he theorizes have not been substantiated for the reasons discussed above. Accordingly, I do not find that his causal theory is based on sound and reliable scientific or medical explanation despite the volume of material provided. In that regard, it is worth noting that this is not a new criticism of Dr. Akbari. *Nieves v. Sec'y of Health & Human Servs.*, No. 18-1602V, 2023 WL 3580148, at *44 (Fed. Cl. Spec. Mstr. May 22, 2023) (observing that Dr. Akbari's "overall theory amounts to a confusing, inter-

related patchwork of contentions, backed up with proof that obscured more than illuminated"), *mot. for rev. denied*, 167 Fed. Cl. 422 (2023); *Williams v. Sec'y of Health & Human Servs*., No. 19-1269V, 2024 WL 5040482, at *42 (Fed. Cl. Spec. Mstr. Nov. 13, 2024) (indicating that "Dr. Akbari offers a treatise of possible immunological concepts, drawn from various clinic studies, but these ideas are not developed, and all fall short of explaining how the flu vaccine can cause [fibromyalgia]. He discusses cytokines, chemokines, and inflammasomes and their roles in causing inflammation. But he does not address basic questions."); *Efron v. Sec'y of Health & Human Servs*., No. 20-1405V, 2025 WL 408219, at *21 (Fed. Cl. Spec. Mstr. Jan. 2, 2025) (stating that "Dr. Akbari's theory also has a poorly-substantiated, globally-overarching character, in which the initial event of vaccination manages to wreak havoc at *every step of the immune process*, from the innate production of cytokines when the vaccine is first administered, to the immune system's self-regulating safeguards, to the adaptive system's targeted response to the vaccine's antigens. Such a theory is too sweeping to be deemed preponderantly-established."); *Cote*, 2026 WL 1555934, at * 27 (explaining that despite submitting nearly 50 articles, Dr. Akbari's theory of causation did not meaningfully move beyond "broad reliance on autoimmune processes").

In light of all of the above, and considering the record as a whole, petitioner has not preponderantly demonstrated that the flu vaccine can cause SFN.

**b. *Althen* prong three**

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id*. A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id*.; *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 542 (2011), *mot. for recons. denied after remand*, 105 Fed. Cl. 353 (2012), *aff'd per curiam*, 503 F. App'x 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. denied sub nom. C.K. v. Sec'y of Health & Human Servs.*, 113 Fed. Cl. 757 (2013), *aff'd sub nom. Koehn v. Sec'y of Health & Human Servs.*, 773 F.3d 1239 (Fed. Cir. 2014).

Petitioner argues that the onset of symptoms of her SFN occurred no sooner than two days post-vaccination, but more likely about one to two weeks post-vaccination. (ECF No. 80, p. 70.) Petitioner argues that this timing is appropriate for an autoimmune and inflammatory response leading to SFN, consistent with her experts' opinions. (*Id*. at 71.) She also argues that her treating physicians temporally associated her SFN to her vaccination. (*Id*. at 72.) In response, respondent raises three points. First, respondent contends that, because petitioner has not met her

burden under *Althen* prong one, there is by definition no medically acceptable timeframe for onset of SFN following the flu vaccination. (ECF No. 82, p. 67.) Second, based on respondent's interpretation of the medical history, the actual onset of petitioner's SFN occurred *pre*-vaccination, which is incompatible with the vaccine being its cause. (*Id*. at 68.) And, third, even assuming *arguendo* that the SFN onset occurred post-vaccination, respondent favors an onset of symptoms within two days of vaccination, which is not consistent with the time needed for an autoimmune response via molecular mimicry to have occurred. (*Id*. at 71.) I credit respondent's second argument and find it is dispositive under *Althen* prong three.[23]

Dr. Willer is not persuasive in seeking to distinguish petitioner's September 28, 2017 presentation for neuropathy affecting her feet from her subsequently diagnosed SFN. (Ex. 3, pp. 57-61.) The record documents that, about a week prior to the vaccination at issue, petitioner sought care specifically with a chief complaint of pain in both feet, which she described as including "tingling sensation of pain, burning sensation." (*Id.* at 57.) As petitioner notes in her motion, she had a prior history of chronic back and neck pain radiating to her feet. (ECF No. 80, p. 5 (citing Ex. 39, pp. 6-8, 18).) However, petitioner raised this chief complaint of burning and tingling foot pain just one day after presenting for pain management related to her back and neck pain without mentioning these symptoms, strongly suggesting the burning and tingling sensations in the feet represented a new condition. (*Compare* Ex. 3, p. 57 (September 28, 2017 primary care encounter with chief complaint of foot pain), *with* Ex. 39, p. 18 (September 27, 2017 pain management encounter describing chronic back pain radiating to hips and feet).) Indeed, the next time petitioner returned for pain management on October 18, 2017, which was also her first post-vaccination medical

---

[23] In her motion, petitioner seemingly sought to argue that the prior Rule 5 order had already effectively resolved *Althen* prong three. She noted that "in his Rule 5 Order, Special Master Horner clarified that an onset of SFN symptoms within two weeks of the flu vaccine would be acceptable by stating 'though one would not generally expect the proposed two-week latency to be controversial if, for example, Dr. Willer opined that an autoimmune process was at issue,' when referencing the necessary proof for *Althen* prong three." (ECF No. 80, pp. 71-72 (quoting ECF No. 67, p. 3).) Thus, she argued "[b]ased on this statement, and because Dr. Akbari and Dr[.] Willer have relied on the aforementioned autoimmune process theory, it is implied that Petitioner's onset within two weeks is an acceptable temporal relationship." (*Id*. at 72.) Importantly, however the Rule 5 order did not provide any tentative finding or conclusion either as to the factual question of onset or the medical/scientific question of whether that onset supported a causal inference. The statement quoted by petitioner was in the context of stating that Dr. Willer's opinion as articulated up to that point was inadequate to assess the issue. For context, a more complete quote of the order, which was preceded by a discussion of the experts' competing interpretations of onset, is as follows:

> If Dr. Spain is ultimately more persuasive regarding onset, then obviously this will have implications for both *Althen* prongs two and three. Otherwise, the lack of a clearly articulated theory under *Althen* prong one leaves it difficult to assess whether Dr. Willer's assessment of onset favors vaccine-causation in this case, though one would not generally expect the proposed two-week latency to be controversial if, for example, Dr. Willer opined that an autoimmune process was at issue.

(ECF No. 67, p. 3.) Consistent with this, respondent has not argued in his motion response that a two-week latency would be inconsistent with an autoimmune process. However, given the other issues presented, that is not dispositive of *Althen* prong three.

encounter, she distinguished her foot pain and numbness from her chronic conditions, with "foot problem" being added to her chief complaints. During this encounter, petitioner described her "foot problem" similarly to her prior September 28, 2017 encounter with Dr. Bennov, *i.e.*, numbness and burning sensation of the bilateral feet. (Ex. 39, p. 7.) Contrary to Dr. Willer's suggestion that the "unremarkable" neurologic exam with Dr. Bennov on September 28 is significant (Ex. 105, p. 1), Dr. Spain has reasonably explained why the physical exam performed at that time was diagnostic of diabetic neuropathy broadly but inadequate to more definitively diagnose the specific type of neuropathy that was present (Ex. C, pp. 5-6). Thus, because petitioner went on to be more definitively diagnosed with SFN, Dr. Spain is persuasive in opining that the subsequently diagnosed SFN is the best explanation for petitioner's preceding neuropathic symptoms, which were clearly documented by contemporaneous treatment records to have begun prior to vaccination. Indeed, "'burning feet' syndrome is perhaps the most common presentation of small-fiber neuropathy (DSFN) in clinical practice." (Victoria A. Low, *Detection of Small-Fiber Neuropathy by Sudomotor Testing*, 34 MUSCLE & NERVE 57 (2006) (Ex. 109, Tab Z, p. 1); *see also* John D. Stewart et al., *Distal Small Fiber Neuropathy: Results of Tests of Sweating and Autonomic Cardiovascular Reflexes*, 15 MUSCLE & NERVE 661 (1992) (Ex. 110, Tab I, p. 1) (noting that "[p]atients with DSFN often present with 'positive' symptoms such as tingling, prickling, and burning (dyesthesias) in the extremities").)

Dr. Willer contends that the pre-vaccination symptoms cannot be related to the later diagnosed SFN because they were attributed to diabetic neuropathy which should present as length-dependent, whereas petitioner's SFN was non-length-dependent and, therefore, inflammatory. (Ex. 106, pp. 1-2.) He cites three considerations. First, he contends that petitioner's symptoms changed post-vaccination, with new complaints of icy and stabbing pain located in different locations. (Ex. 105, p. 14.) Second, he contends that petitioner's post-vaccination presentation should be credited as a new onset of sensory symptoms affecting her upper and lower extremities all at once equally, which would be a non-length-dependent pattern. (Ex. 106, pp. 1-2.) Third, he observes that petitioner's skin biopsy confirmed that she had more nerve loss at the calf than at the foot, which would be a non-length-dependent pattern. (*Id.*) An initial onset of ascending lower extremity symptoms followed by later onset of symptoms affecting the hands would be consistent with a length-dependent pattern of SFN. (Grazia Devigili et al., *Clinical Diagnosis and Management of Small Fiber Neuropathy: An Update on Best Practice*, 20 EXPERT REV. NEUROTHERAPEUTICS 967 (2020) (Ex. A, Tab 19, p. 2).) This would be consistent with a diabetic SFN, but would be inconsistent with petitioner's biopsy result, which confirmed a non-length-dependent pattern. However, an onset of SFN initially affecting all limbs equally would be consistent with a non-length-dependent pattern of SFN. Thus, because Dr. Willer interprets the post-vaccination medical records as presenting such a symptom pattern, he suggests this would be a reason to distinguish petitioner's pre-vaccination complaint from her post-vaccination complaint, thereby placing onset of the SFN post-vaccination. However, this is not persuasive.

Even setting Dr. Bennov's September 28, 2017 encounter aside, the post-vaccination treatment records favor an onset of foot symptoms occurring first followed

later by other symptoms including those affecting her hands. The first time that petitioner presented for care post-vaccination was on October 18, 2017, about two weeks post-vaccination. At that time, she presented to pain management with a new complaint of a "foot problem," consisting of numbness and burning sensation in her feet consistent with what she reported to Dr. Bennov prior to vaccination, and also was noted to have paresthesias of the upper extremities associated with her neck pain, which had not been documented at her prior encounter. (Ex. 39, p. 7.) Timing of onset was not documented for either condition. However, when petitioner next presented for care of this condition at the emergency department on October 25, 2017, she provided a history that specifically indicated that she first experienced a burning sensation in her feet for several weeks and only then "moving up legs into back and also in her hands" even in the context of reporting her condition as a new post-vaccination condition. (Ex. 4, p. 10.) Dr. Willer cites two records for the proposition that all the extremities were affected equally, a February 14, 2018 record by Dr. McCluskey (Ex. 5, p. 31) and one of the histories petitioner provided when she presented to emergency department on October 25, 2017 (Ex. 4, p. 6). However, neither of these two records clearly document that the symptoms affecting the hand began at the same time as the lower extremity symptoms. In fact, when petitioner first presented to Dr. McCluskey on November 28, 2017, it was specifically documented that petitioner's symptoms evolved after initially beginning with pain in both feet. (Ex. 5, p. 15.) Indeed, when petitioner presented to the emergency department it was specifically observed that her sensory symptoms developed in a length-dependent pattern. (Ex. 4, p. 17.) Thus, even completely setting aside Dr. Bennov's September 28, 2017 assessment of a diabetic neuropathy, the post-vaccination records still would not favor a pattern of onset clearly consistent with a non-length-dependent neuropathy. Even in her later affidavit, which was prepared for this case and in which petitioner seeks to more clearly place her symptoms post-vaccination, petitioner still indicates that her symptoms started in her feet. (Ex. 2, p. 2.)

Nor is Dr. Willer's identification of a post-vaccination change in the nature of petitioner's symptoms persuasive. Dr. Willer cites Dr. McCloskey's February 14, 2018 record for the proposition that petitioner only complained of "stabling" and "icy" pain after her vaccination. (*Compare* Ex. 5, p. 31 (post-vaccination record, in which Dr. McCloskey documented pain in both feet as "burning, icy, stabbing"), *with* Ex. 3, pp. 57-61 (pre-vaccination record, in which Dr. Bennov documented pain as "tingling" and "burning").) However, this misunderstands the history being provided. When petitioner first provided a history to Dr. McCloskey on November 28, 2017, she at that time included the descriptor "stabbing" to describe the initial onset of her foot pain. (Ex. 5, p. 15.) And while the medical records show that, by that time, petitioner had begun to report that this pain had occurred post-vaccination, she also dated the initial onset of this stabbing pain back to September. (*Id.*) Accordingly, I do not find the reports of "icy" or "stabbing" pain to meaningfully distinguish a separate onset of a different kind of pain. Considering the medical records as a whole, petitioner only ever described a single onset of foot pain, which she consistently described as burning and also inconsistently characterized with other subjective descriptors. (*See* Ex. C, p. 6 (Dr. Spain noting that petitioner's subjective descriptors are not entirely clear).)

The experts did nonetheless agree that petitioner's skin biopsy showed that her SFN was non-length-dependent because she suffered more nerve loss at the calf than the foot. However, even accepting that petitioner's SFN was non-length-dependent, Dr. Willer overstates the significance of the MacDonald study's findings on which he relies for the proposition that this points specifically to an inflammatory etiology. While the specific figures Dr. Willer cited from MacDonald et al. are correct (the study noted that, in its cohort of 101 subjects, 30% of inflammatory SFN was non-length-dependent compared to only 3.7% of hyperglycemic SFN (MacDonald et al., *supra*, at Ex. 92, Tab M, p. 4 tbl. 3)), nothing in the study purports to suggest that the distribution pattern is actually diagnostic of subtype. A non-length-dependent pattern existed in only a minority of subjects in any given subtype and, moreover, was shown to exist in every group.[24] (*Id.*) Additionally, the percentage figures are potentially misleading, given that the three subgroups are disproportionately represented. The 11.8% of non-length-dependent subjects among the 51 idiopathic cases represents about six subjects, whereas the 30% of the 10 subjects with inflammatory SFN represents three subjects, suggesting that someone with a non-length-dependent SFN is twice as likely to have no known cause for their SFN than an inflammatory cause. (*Id.*) Overall, an inflammatory etiology accounted for less than a quarter of the non-length-dependent cases and less than 10% of all SFN. (*Id*. at 4 tbl. 4.) Thus, even granting that diabetes would be more likely to result in a length-dependent pattern, Dr. Willer is not persuasive in contending that the pattern of petitioner's SFN means it must necessarily have been inflammatory.

Petitioner's documented pre-existing symptoms of neuropathy do not necessarily need to have been caused by her diabetes to evidence that her SFN pre-dated her vaccination. The parties have debated several potential causes of petitioner's SFN and, in any event, SFN often remains idiopathic even after investigation. Indeed, Dr. Bennov ultimately changed his assessment from diabetic neuropathy to neuropathy of unclear etiology. (Ex. 3, p. 54.) Even if Dr. Willer were persuasive in opining that the non-length-dependent pattern of petitioner's SFN strongly suggested an inflammatory or immune etiology, it still would not necessarily follow that this is controlling as to the initial onset of the condition. Dr. Willer suggests that an inflammatory etiology suggests a post-vaccination onset, because he has identified the flu vaccine as a *potential* inflammatory insult. However, Dr. Willer's reasoning is contradicted by the clear evidence indicating that petitioner first developed symptoms consistent with her SFN prior to vaccination. Moreover, an inflammatory etiology does not point to a specific cause without more. For example, literature filed by respondent suggests that SFN presenting in a non-length-dependent manner could also be related to other immune-mediated or autoimmune conditions, such as Sjögren's syndrome or paraneoplastic syndrome. (Devigili et al., *supra*, at Ex. A, Tab 19, p. 2.)

[24] Further still, the authors separately noted that sex also showed a significant difference between length-dependent and non-length-dependent patterns of SFN. (MacDonald et al., *supra*, at Ex. 92, Tab M, p. 4 tbl. 4.) While women (such as petitioner) made up a slight majority of cases of length-dependent SFN, they accounted for over 90% of cases of non-length-dependent SFN. (*Id.*)

Petitioner argues that the temporal association to vaccination is also supported by her treating physicians. (ECF No. 80, p. 72 (citing Ex. 4, pp. 6, 12; Ex. 5, p. 15; Ex. 3, p. 265).) However, I agree with respondent that these notations merely document the history petitioner was providing to her physicians. Yet, for the reasons discussed above, that history was not accurate given her September 28, 2017 presentation with a chief complaint of burning and tingling foot pain. (Ex. 3, p. 57.) Moreover, petitioner's reports of a post-vaccination onset were inconsistent in themselves. Ultimately, even in her motion for a ruling on the written record, petitioner does not commit to whether her symptoms began two days or two weeks post-vaccination, undercutting the notion that what petitioner was relaying was a distinct recollection of the onset of her new symptoms. (ECF No. 80, p. 70.) For example, as discussed in the fact summary above, during the course of a single emergency department encounter on October 25, 2017, petitioner gave differing accounts of the initial onset of her condition, including accounts that were facially incorrect in certain respects. Moreover, in some of the histories she provided, petitioner placed her symptoms post-vaccination while also inaccurately recalling that she had been vaccinated earlier than she actually had.

For all these reasons, petitioner has not met her preponderant burden of proof under *Althen* prong three.

### c. *Althen* prong two

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a vacinee's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326; *Grant*, 956 F.2d at 1148. Medical records are generally viewed as particularly trustworthy evidence. *Cucuras*, 993 F.2d at 1528. However, medical records and/or statements of a treating physician's views do not *per se* bind the special master. *See* § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder*, 88 Fed. Cl. at 745 n.67 ("[T]here is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted."). A petitioner may support a cause-in-fact claim through either medical records or expert medical opinion. § 300aa-13(a). The special master is required to consider all the relevant evidence of record, draw plausible inferences, and articulate a rational basis for the decision. *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines*, 940 F.2d at 1528).

Petitioner argues that her satisfaction of *Althen* prongs one and three is probative as to a logical sequence of cause and effect. (ECF No. 80, pp. 75-76 (citing *Capizzano*, 440 F.3d at 1326).) Thus, she argues that her experts' opinions supporting the vaccine as the cause of her SFN are sufficient to carry her burden under *Althen* prong two. (*Id*. at 76.) Important to that point, she argues that Dr. Willer has supported the vaccine as a more likely cause of her condition than her diabetes, though she also argues that she is not obligated to eliminate her diabetes as a cause of her condition in making her *prima facie* showing. (*Id*. at 76-77, 81-82.) Petitioner also cites a number of notations

within the medical records that she characterizes as treating physician opinions supportive of the causal relationship she alleges. (*Id*. at 77-81.)

Respondent disagrees that the treating physician notations cited by petitioner represent causal opinions. (ECF No. 82, pp. 55-58.) Instead, he contends they merely reflect petitioner's own subjective reporting. (*Id*.) Respondent also notes that petitioner has received prior flu vaccination[25] without injury and contends that petitioner's condition is instead due to her pre-existing health conditions, including diabetes, hypothyroidism, hypertriglyceridemia, vitamin D deficiency, and tobacco use. (*Id*. at 58-61.) Moreover, respondent argues that petitioner's SFN pre-dated the vaccination at issue and that she has not demonstrated any significant aggravation of her SFN by her vaccination. (*Id*. at 61-63.)

Petitioner is persuasive in stressing that the fact that her SFN was non-length-dependent does ultimately undercut the specific assertion that it was likely due to her diabetes, though it does not entirely rule out diabetes as the cause of her SFN. (*E.g.*, Devigili et al., *supra*, at Ex. A, Tab 19, p. 2 (noting that non-length-dependent SFN is "predominantly" seen in immune-mediated disorders, whereas length-dependent SFN is "predominantly" seen in metabolic causes, such as diabetes).) Indeed, Dr. Bennov's diagnosis of her neuropathy as diabetic neuropathy was rendered prior to the biopsy confirmation of a non-length-dependent SFN. However, this is ultimately of little significance. Given petitioner's inability to meet her burden of proof under either *Althen* prongs one or three, it is not actually necessary to resolve the etiology of petitioner's SFN in order to conclude that there is not a logical sequence of cause and effect that implicates her vaccination as a cause of her condition. The parties' experts debated several other potential causes of SFN apart from either diabetes or vaccination, but in any event, even the literature filed by petitioner indicates that a majority of cases of SFN remain idiopathic after investigation. (MacDonald et al., *supra*, at Ex. 92, Tab M, p. 5.) Thus, especially given petitioner's overall complicated medical history, the fact that a specific, indisputable explanation for petitioner's SFN is not readily available does not point to the vaccination as causal without more. "Although probative, neither a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation." *Althen*, 418 F.3d at 1278 (citing *Grant*, 956 F.2d at 1149).

I also agree with respondent that the treating physician notations cited by petitioner reflect only acknowledgement of the history provided by petitioner and not causal opinions.[26] Petitioner also argues that a number of additional treating physician

[25] Specifically, respondent notes that the medical records document an October 1, 2015 flu vaccination. (ECF No. 82, p. 3 (citing Ex. 3, p. 76).)

[26] Specifically, I do not find that the following statements constitute causal opinions implicating petitioner's vaccination as a cause of her SFN: Ex. 3, p. 305 (stating in the history of present illness of an emergency department record that "[t]he lower extremity neuropathy has been present for 7 months and was evaluated by neurology felt to be due to flu vaccine"); Ex. 71, p. 53 (documenting during an in-home health services evaluation under "past medical history" that petitioner "received the flu shot and had

statements recognizing the temporal relationship between the flu vaccine and petitioner's SFN are important, even if they do not provide a causal link, because the physicians would not have recorded the fact of the flu vaccine if they did not think it was important. (ECF No. 80, pp. 78-81 (citing Ex. 3, pp. 54, 232, 265; Ex. 4, p. 6; Ex. 5, pp. 15, 31; Ex. 7, p. 32; Ex. 8, pp. 1039-40; Ex. 9, p. 14; Ex. 14, p. 33; Ex. 62, p. 4).) I do not agree. Although there are factual questions for which such notations can certainly be relevant (for example, timing of onset of symptoms), a treating physician's mere reference to a temporal relationship between vaccination and symptoms is not equivalent to drawing a causal connection. *Moberly*, 592 F.3d at 1323-24; *Isaac*, 2012 WL 3609993, at *26 (explaining that "[a] treating physician's recognition of a temporal relationship does not advance the analysis of causation"). For example, a special master has previously explained that medical records may include notations where a physician "may well be indicating a *question* in the physician's mind whether there is a causal relationship, or a *suspicion* that there might be a causal relationship. However, that is quite different from an indication that such physician has reached a *conclusion* concerning a causal relationship . . . ." *Stapleford v. Sec'y of Health and Human Servs.*, No. 03-234V, 2009 WL 1456441, at *17 n.24 (Fed. Cl. Spec. Mstr. May 1, 2009), *aff'd*, 89 Fed. Cl. 456 (2009). Thus, even with petitioner having repeatedly raised her own suspicion of vaccine causation with her medical providers, this case lacks support from petitioner's treating physicians.

For all these reasons, petitioner has not met her preponderant burden of proof under *Althen* prong two.

## VI. Conclusion

Although petitioner has my sympathy for the pain and discomfort she has endured, for all the reasons discussed above, I find that she has not met her burden of proof. Therefore, pursuant to § 300aa-12(d)(3)(A) and Vaccine Rule 10, this decision concludes that petitioner is not entitled to an award of compensation. Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a).

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master

---

complications neurologically"); Ex. 41, p. 9 (documenting in the history of present illness that "[s]he was diagnosed with small fiber neuritis from a flu shot"); *id.* at 10 (planning to refer petitioner to a rehabilitation medicine specialist "in light of the neuritis from the flu shot"); Ex. 6, p. 4 (documenting in the history of present illness that "[s]he was seen by multiple providers until Dr[.] McCloskey at Penn diagnosed her with transverse myelitis and small fiber polyneuropathy attributable to the flu shot").